2021 IL App (4th) 190043

NO. 4-19-0043

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| THERON PRICE, | ) | No. 15CF411 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Cavanagh and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1   In July 2015, the State charged defendant, Theron Price, with first degree murder in the shooting death of William Newbern. 720 ILCS 5/9-1(a)(1) (West 2012). In October 2018, a jury convicted defendant. The trial court later sentenced him to 60 years in prison.

¶ 2   Defendant appeals, arguing (1) the trial court erred by admitting into evidence deleted text messages recovered from defendant's phone, (2) the trial court erred by admitting other crimes evidence that defendant possessed a gun unrelated to the shooting, (3) the trial court erred by admitting expert opinion testimony from a witness that Newbern was found with signs of rigor mortis, (4) the State's closing argument was improper in that it attempted to lower the burden of proof, and (5) defendant was denied the effective assistance of counsel because of counsel's failure to adequately prevent these errors. We disagree and affirm.

¶ 3                            I. BACKGROUND

¶ 4                       A. The Charges Against Defendant

¶ 5         In July 2015, the State charged defendant with three counts of first degree murder in the shooting death of William Newbern. *Id.* The State alleged defendant personally discharged a firearm, causing Newbern's death on November 24, 2014.

¶ 6                            B. Motions *in Limine*

¶ 7         Prior to trial, the State and defendant filed several motions *in limine* seeking to admit and exclude certain evidence. Relevant to this appeal, the State sought the admission of deleted text messages recovered from defendant's cell phone by a Federal Bureau of Investigation (FBI) agent. The trial court denied the State's motion and excluded the evidence because the State failed to authenticate the deleted text messages.

¶ 8         Defendant filed a motion *in limine* to exclude testimony from paramedic Timothy Lawson that Newbern's body displayed signs of rigor mortis when Lawson examined it at the scene because Lawson was not an expert. The State argued that such testimony was not an expert opinion but merely an observation based upon his 20 years' experience as a paramedic. The trial court denied defendant's motion.

¶ 9         C. The Evidence at Defendant's Trial—The State's Case

¶ 10        In October 2018, defendant's case proceeded to a jury trial, and the State presented the following evidence.

¶ 11            1. *The Discovery of Newbern's Body and the Crime Scene*

¶ 12        Forgenia Coe testified she lived at 502 Griffin Street in Danville on November 25, 2014. Sometime before 7 a.m., she saw a body lying in a yard across the street. She found the body to be that of a man who was unresponsive and cold to the touch. Coe covered the body with a

blanket and called 911. A firefighter testified that he arrived on scene and found the body to be cold, stiff, and without a pulse. The firefighter recovered a driver's license from the body identifying the man as William Newbern.

¶ 13     Tim Lawson testified he had been a paramedic in Danville for nearly 30 years and received 18 months of training on topics such as anatomy, physiology, medications, and lifesaving treatment. He was also trained to determine if someone was deceased and to record his observations. On November 25, 2014, he responded to a call shortly before 7 a.m. Lawson stated he observed a body lying facedown on the ground. The man was not breathing, did not have a pulse, and had rigor mortis. Defendant objected, arguing Lawson's statement about rigor mortis constituted improper opinion testimony. Lawson then testified that he was trained to look for rigor mortis, which was a sign of death and occurs when someone "is deceased." Lawson stated that the body "had obvious rigor mortis." The objection was overruled. Lawson further stated the body was "ashen" or gray looking and "very obviously he was cold to the touch."

¶ 14     Police officers at the scene discovered a blood trail from Newbern's body leading to 1227 Clarence, an apartment complex located behind 502 North Griffin. The blood trail went over a chain-link fence and up to the open window of apartment 4. (We note it was later determined that Newbern lived in apartment 4.) Inside the window was a kitchen and living room with "blood all over." While police were on scene, defendant arrived, followed shortly thereafter by Jennifer Kindle. They informed the police that they lived together in apartment 2.

¶ 15     The police recovered bullets but no casings from Newbern's apartment. The police never located the firearm used in Newbern's murder. A forensic expert testified that all of the bullets had been fired from the same gun.

¶ 16                                    2. *The Autopsy*

- 3 -

¶ 17    Shiping Bao testified he was a forensic pathologist and performed an autopsy of Newbern. Bao noted three gunshot wounds in Newbern's back, two of which exited through the right side of Newbern's chest. Bao opined that Newbern died from blood loss resulting from the gunshot wounds. Bao determined that the shots were not fired from close range, meaning the shooter was more than five feet away. Toxicology tests showed Newbern had cocaine, alcohol, and an antidepressant drug in his system. Bao stated that (1) he could not testify as to the time of death and (2) Newbern could have died on November 24 or 25.

¶ 18    On cross-examination, Bao testified that it is "impossible" to testify to the time of death. He explained that there are too many variables, such as body temperature, environmental conditions, medications used, and body composition (fat and muscle), to permit anyone to determine time of death. As to time of death determinations, he emphasized, "Nobody can do that," and "[i]t's fiction."

¶ 19    3. *The Initial Investigation*

¶ 20    a. Hope Scott: Newbern's Girlfriend

¶ 21    Hope Scott testified she was in a romantic relationship with Newbern that began in early 2014. While they were dating, Newbern was "a recovering addict" and took medication for depression. On November 24, 2014, Scott arrived at Newbern's apartment at about 4 p.m.; defendant arrived shortly thereafter. Newbern and defendant left together and returned with a bottle of liquor. Newbern and defendant began drinking, but Scott did not join them.

¶ 22    Scott testified that Newbern and defendant began to argue over Newbern's failure to pay defendant for a speaker defendant had given him. Scott stated she left the apartment at about 6:30 p.m. Scott testified, "I left because they stated to argue, and [Newbern] said, 'We aren't going to do this in front of her,' and he walked me to my car." Scott said she saw Newbern walk back

into his apartment with defendant before she left.

¶ 23    Scott returned to her home in Indiana. She called and texted Newbern around 7:15 p.m. to let him know she got home safely, but he did not answer. Scott became concerned the next morning when Newbern had still not answered.

¶ 24    b. Detective Brian Lange: Interview with Defendant

¶ 25    Detective Brian Lange of the Danville Police Department testified that he and Detective Philip Wilson interviewed defendant on the morning of November 25, 2014. During the interview, Lange asked defendant if he had fired a gun recently, and defendant stated he "hadn't in years." Defendant also told Lange that he argued with Newbern in the past but "it never got physical." Defendant told Lange that, the night before, he and Newbern "were in an argument" about Newbern's failure to pay for a speaker defendant had given him.

¶ 26    Defendant told Lange that he could not remember when he left the apartment because "when he drinks alcohol he doesn't remember a lot." Defendant recalled that no one was with Newbern when defendant left his apartment and he heard Newbern lock the door behind him. After he left, defendant "drove around" for several hours, as he routinely does, and he became lost. Defendant told Lange he called 911 at some point from somewhere in Indiana to ask for help getting back to Danville. At a gas station, "some security guards" put directions into defendant's phone to get him back to Danville.

¶ 27    Lange testified that defendant had his cell phone with him during the interview and he signed a written consent for the police to search his phone. Lange told defendant that Wilson was taking the phone to "dump it" and "take the information off of it." Defendant also signed written consent forms for the police to search his vehicle and his apartment. Lange stated they collected defendant's boots, pants, and shirt for evidence.

¶ 28    Lange testified that defendant was very cooperative.

"During the interview when [defendant] was talking about his phones and we asked him if he called anybody, he got his phone out and at one point handed it over to Detective Wilson because he wasn't sure how to get into his recent calls or some of the different apps on his phone."

"He was looking through like the recent calls where he was trying to show us the—show Detective Wilson the MapQuest or the route navigation thing."

¶ 29    c. Detective Ralph Dunham: Defendant's Arrest and Second Interview

¶ 30    Detective Ralph Dunham of the Danville Police Department testified that, in July 2015, he arrested defendant and conducted a second interview. Defendant made substantially the same statements as in his prior interview with Lange and Wilson.

¶ 31    Since the first interview, however, a forensic scientist identified gunshot residue (GSR) on defendant's clothing that the police had collected at the conclusion of the first interview. When Dunham asked defendant about the GSR, defendant responded that he worked at "Mervis Industrial," a metal recycling facility. Defendant told Dunham he did not know where the GSR was from if not from work because he had not fired a gun. Dunham told defendant the police also found Newbern's blood on his clothes. Defendant stated that he and Mr. Newbern greeted each other every time they saw each other with a hug and that Mr. Newbern occasionally had open wounds on him when he hugged him.

¶ 32    d. Forensic Evidence

¶ 33    James Riggins testified that he collected GSR samples from the cuffs of defendant's blue work jacket. Scott Rochowicz, a forensic scientist with the Illinois State Police, testified as an expert in GSR. Rochowicz found GSR on the samples collected from defendant's steering

wheel, door handle, and jacket.

¶ 34 Rochowicz stated that defendant's working at a metal recycling plant would not have an impact upon his analysis because GSR can only be produced by explosive force. GSR can be transferred to clothing only by handling an object that has GSR on it.

¶ 35 Rochowicz acknowledged that it was possible for the GSR found on defendant's belongings to come from handling materials being recycled, such as brass casings or firearm parts. He also acknowledged that GSR will remain in place unless it is physically removed by, for example, cleaning or handling an object.

¶ 36 An expert in the collection of biological samples testified that she located a drop of blood on the outside side of defendant's left boot near the heel and swabbed the blood for DNA analysis. She did not find blood on defendant's work jacket or clothes. Another forensic scientist testified as an expert in DNA analysis. She testified that the drop of blood found on defendant's left boot was a match for Newbern.

¶ 37 The State introduced testimony from law enforcement that they examined Newbern's cell phone and phone records obtained from AT&T. The analysis revealed that the last outgoing call or message sent from the phone occurred at 5:56 p.m. on November 24.

¶ 38 e. Lavonda Levingston: Defendant's Prior Possession of a Gun

¶ 39 Lavonda Levingston testified that she was in a romantic relationship with Newbern for about two years and was dating him when he died. One evening in the spring of 2014, Levingston was visiting a friend when defendant arrived at his (own) apartment and began acting like he was going to shoot himself. According to Levingston, defendant "stated he had ran from the police or had some type of altercation. And when the girlfriend came outside to get him out the truck to convince him to come in the house, I saw two guns and he was doing gunplay like he

was going to shoot [himself] and then the gun discharged and I screamed and ran."

¶ 40                                    f. Jennifer Kindle: Defendant's Then Girlfriend

¶ 41            Jennifer Kindle testified she dated defendant for about two years and was living with him on November 24, 2014, which was the day before her birthday. She got home from work at around 4:30 p.m. and was sick with the flu. Defendant was standing out front with some neighbors, including Newbern. Kindle went inside and lay down.

¶ 42            Sometime around 8 or 8:30, defendant came into the apartment and asked if Kindle was mad at him. She said she was because he was drinking with his friends instead of spending time with her for her birthday. Kindle testified that they "argued" but did "[n]ot really fight." Kindle said she lay back down and defendant walked outside. Kindle then got dressed and left to visit her father. When she left, she saw defendant leaning up against his car. Kindle stated she arrived at her father's house sometime in the 8 o'clock hour because they were watching Monday night football. "So I just remember sitting with him for a little bit just trying to give either [defendant] time to calm down so I didn't go home to an argument, and then I left and went back home." The next morning, she went to work but soon returned home because she was too sick. When she got home, defendant arrived not long after her.

¶ 43            Kindle testified that defendant called her late at night on the night of the murder claiming to be at a woman's house and unable to find his way home. (Kindle declined to help.) Kindle was not sure when he called but remembered she was back in bed at their apartment. Kindle said the speaker issue between defendant and Newbern was not an argument. She explained that defendant had given Newbern a speaker but then took it back when Newbern did not pay him. Defendant then gave Newbern the speaker again a few days later.

¶ 44            The State asked Kindle if she saw defendant handle a firearm earlier in the year.

Kindle answered not the year of the shooting. She explained that the first month they began dating she saw him with a gun. He told her he was trying to help his friend sell it. Kindle had a fear of guns and told defendant she was not going to be around him if he had one. Defendant apologized and promised to take the gun back to his friend. Kindle believed defendant had been honest with her when he told her he returned the gun. Kindle never saw defendant with a firearm again.

¶ 45        Kindle said defendant was wearing his Mervis jacket and uniform when she saw him on November 24 and 25 and assumed it was the same one he wore to work on November 24. Kindle stated she never saw a gun in the apartment. Kindle said the apartment was typically very clean and she and defendant kept their things separate. Kindle described defendant as a pretty clean person who "very much so" took care of his clothes, washed up, and cleaned things.

¶ 46        g. Detective Philip Wilson: Obtaining Data From Defendant's Phone

¶ 47        Wilson testified he assisted with the investigation into Newbern's murder. During defendant's first interview, defendant gave written consent to the police to search his phone for "text messages, contacts, GPS, call log, and all applications." Wilson personally collected the phone from defendant and took it to the University of Illinois Police Department. Wilson used their Cellebrite equipment to extract the contents of defendant's phone, which he later placed onto a USB thumb drive. Wilson testified that he was trained to use Cellebrite, an extraction device that allows law enforcement to download, or "dump," the contents of cellular devices. Wilson described his training as follows:

> "The Cellebrite class was basically an instructional class to show detectives how to download the contents of a phone. There was a step-by-step process where they taught us. They had us do practicals where we actually had different types of phones[.] [T]hey gave us scenarios[,] and we would have to extract the information

out of the phone."

¶ 48　　　Wilson testified that the machine he used was the same as the one he trained on, he could tell if something went wrong with the extraction, and the data could not be altered.

¶ 49　　　Wilson further testified that he obtained a search warrant for the telephone records from Sprint associated with defendant's phone number. He requested a record of all incoming and outgoing calls, text messages, Internet site access, cell site tower locations, and GPS information. Wilson received a CD from Sprint containing the copies of the records.

¶ 50　　　Wilson further testified that he spoke with defendant and Kindle at the apartment complex on 1227 Clarence Street on November 25, 2014, and told defendant Newbern had been killed. When asked if he observed a reaction, Wilson stated, "No. [Defendant] was stoic[.] [T]here was no expression."

¶ 51　　　On cross-examination, Wilson acknowledged that he did not know if someone had already told defendant that Newbern had died. Wilson stated that defendant rode in the back seat of a police car as he and another detective took defendant to be interviewed. During that interview, defendant told Wilson and Lange that he called 911, and Wilson looked through defendant's phone. Wilson stated, "He was trying to show us different contacts and calls made, and I was assisting him." Wilson said he found a call made to 911 while looking through defendant's phone.

¶ 52　　　　　　　　　　h. Agent Greg Catey

¶ 53　　　Greg Catey, an FBI agent, testified that he examined defendant's cell phone records, obtained from Sprint, from November 24 and 25, 2014, to determine where the phone had been used based on cell phone tower data. In general, his testimony confirmed defendant's claims of where he had been throughout the night. Specifically, defendant's phone was in the area of 1227 Clarence Street at 6 p.m., 7 p.m., and 9 p.m. Between 8 p.m. and 8:50 p.m., defendant's phone was

in a different area of Danville. The phone then travelled up Interstate 57 (10:40 p.m.—Kankakee) into the Chicago area (between 11:31 p.m. and 12:39 a.m.). Around 2 a.m., the phone was in northwest Indiana. Defendant called 911 while in Indiana at 2:39 a.m. The phone then traveled back into Illinois and the Chicago area, as far as Joliet around 5 to 6 a.m. before returning to northwest Indiana (7 to 8 a.m.). The phone then returned to Danville.

¶ 54                                    4. *The Text Messages*

¶ 55        At the beginning of the fifth (and second to last) day of trial, the State renewed its motion *in limine* to admit testimony related to text messages sent to defendant by Gaddis Price, defendant's brother, that defendant had deleted from his phone. The State acknowledged it did not have any new information for the court to consider beyond the information contained in the memorandum supporting the motion. The State argued that the statements in the text messages were admissible because they would be authenticated by Gaddis, who had sent them. The State further contended that the phone records confirmed Gaddis and defendant spoke on the phone and exchanged text messages in the early morning hours of November 25. The State also noted that the testimony of a forensic examiner from the FBI would provide additional reliability to the text messages. The FBI expert would testify how the deleted messages he found on defendant's phone were the ones sent by Gaddis to defendant on November 25 based on his examination of the phone in comparison to the Sprint records.

¶ 56        Defendant argued that the messages were based on hearsay from other people and were speculative. More specifically, because only two of the messages were recovered, the remaining context of the conversation was absent. Further, defendant contended (1) the State had no evidence that defendant provided the information to Gaddis prompting Gaddis's response and (2) Gaddis's statements contained in the memorandum indicated that he was texting advice based

- 11 -

on an unnamed woman telling him his brother was in trouble. Gaddis previously indicated that defendant did not tell him he was in trouble.

¶ 57    Defendant also argued the State was trying to impute a guilty conscience to defendant but its reasoning was circular. In other words, the State was arguing that the content of the messages must be incriminating because it involved cleaning up and "residue," which the State asserted must refer to the murder, which then made the statements incriminating.

¶ 58    The State responded that the reliability of the statements was strong in this case. The phone records revealed the sender and receiver of the messages based on phone numbers. Gaddis would testify that he was the author of the messages and sent them to defendant. The State further argued that the fact that Gaddis and defendant spoke on the phone for 10 minutes before the texts were exchanged was sufficient to infer that the content of the messages referred to the murder.

¶ 59    The trial court agreed with the State and reversed its prior order *in limine*. The court explained that the concerns raised by defendant went to the weight of the evidence rather than its admissibility. The court believed cross-examination would be sufficient to address those concerns.

¶ 60    a. Gaddis Price: Defendant's Brother

¶ 61    Gaddis Price testified he was defendant's brother and stated what his phone number was in November 2014. The following exchange occurred:

> "Q. Did you send messages to your brother on November 25, 2014, in the morning?
>
> A. In the morning?
>
> Q. Early morning or middle of the night?
>
> A. I think so.

Q. What did those messages say?

A. I can't recall. I told him to clean up. I can't remember what they exact [*sic*] say.

Q. Do you recall sending him a message that said, 'You got to piss on your right hand or use ammonia on your shirt and check your clothes for residues'?

A. I think I recall. I can't remember what I exact [*sic*] said, but if you've got the text messages, that's what I said.

Q. Did you also send him the message that said, 'And delete this after you read it and clean yourself'?

A. I think so, if you've got the message. I think so. I can't remember."

¶ 62 Gaddis testified on cross-examination that he did not get the chance to speak with defendant on that night. Defendant asked if Gaddis "remember[ed] texting [defendant], but you can't remember sending these specific ones?" Gaddis answered, "Yeah, because I text a lot of stuff to him, crazy stuff." Gaddis stated that he did not know what was going on in defendant's life when he sent the messages.

¶ 63                    b. Phil Brungardt: Sprint Phone Records

¶ 64 Phil Brungardt testified he was a records custodian at Sprint. He identified the cell phone records relating to defendant's phone number. Brungardt explained that call duration indicated the time the phone connected to the tower and included the time during which the called number was ringing before it was answered. Calls with a duration of zero seconds indicated a text message. Brungardt confirmed that the records showed that defendant called 911 at 2:39 a.m. on November 25 and called Gaddis's phone number at 4:43 a.m. That phone call lasted approximately five minutes. The records also showed that Gaddis and defendant exchanged five text messages

- 13 -

between 4:52 a.m. and 4:56 a.m., three from Gaddis and two from defendant. Finally, Gaddis called defendant at 11:42 p.m. on November 24, and that call lasted a little over eight minutes.

¶ 65                                c. William O'Sullivan: Deleted Text Messages

¶ 66          William O'Sullivan, a forensic examiner with the FBI, testified as an expert in forensic analysis of computers and cell phones. O'Sullivan stated he was trained and experienced at using Cellebrite, which was tested and validated by the FBI every time the program was updated. The FBI accepted Cellebrite as a forensic tool.

¶ 67          O'Sullivan stated he received from the Danville Police a USB drive containing a Cellebrite extraction of defendant's phone. He could tell the extraction was done properly because they used a "hash value to authenticate that acquisition[.] [I]n other words, a mathematical form that states exactly what was acquired matches what was present on the device at the time it was acquired."

¶ 68          O'Sullivan testified that he conducted an analysis to, among other things, locate any deleted messages. O'Sullivan explained that the USB contained "a physical acquisition of [the] phone *** and within the physical acquisition, we have items such as SMS messages, MMS messages, [which is] another form of text messages, web browser history, and of course things like pictures, videos, *** and items you would expect in a cell phone." O'Sullivan used Cellebrite to pull the data from the extraction and put it in a timeline, which helped him see when events occurred, provided the data had dates and times associated with them. The timeline covered the period of November 24, 2014, to November 25, 2014, and put phone calls and text messages in a spreadsheet in chronological order. O'Sullivan stated he and other experts rely on these timelines to review data. However, the timeline was limited in the sense that, if data did not have dates and times associated with them, they would not appear in the timeline, and other methods would have

to be used to get that information. For instance, deleted calls or text messages would not appear in the timeline.

¶ 69        O'Sullivan testified that he could locate deleted information by examining a "hexadecimal view in the program, where a person manually reviews the actual code behind the database." O'Sullivan explained that the hexadecimal view is a way to look at the data from a phone in the same manner as "the cell phone sees it." The Cellebrite program scans the hexadecimal view and shows texts and calls with dates and times; "[h]owever, when the phone or the program can't see the date and times, it will leave those other messages or calls in this hex view, where the content is still there[. I]t's just not presented for view." O'Sullivan explained the reliability of the information found in the hex view as follows:

> "So your MMS messages and your SMS messages in our cell phones are contained in a database. So if we locate something inside of that database, we know for certain that it's a text message. It's not web browser traffic. It's not something from, say *** Facebook, that it is in particular from that particular database."

¶ 70        The following exchange occurred:

> "[ASSISTANT ATTORNEY GENERAL]: Is there a way to tell where you found deleted messages, whether it was working properly or not?
>
> THE WITNESS: Yes. So the way this is configured, the phone and the SMS database, it has a section of that database called a WAL file, or a write-ahead log, which is working with the database. That file will receive messages or send messages through it, and then eventually write those messages to the database. *** [T]hat's how it works in android devices, and oftentimes we'll see the same message in two different locations because of that. That file receives a message,

and it would eventually write it to the main database of the phone."

¶ 71 O'Sullivan stated that he could not testify whether defendant's phone was working properly.

> "I can testify to that the entire contents of the [defendant's phone] were properly acquired, and that [the] hash value, which is a mathematical formula that compare the device to the image, is true and accurate. That is a true and accurate representation of what is on the phone right now."

He added, "The hexadecimal view does show what is on the phone right now, and much of what's in that view is actually present on the phone as a text message right now."

¶ 72 Defendant objected to further testimony, arguing the State had not laid the proper foundation: "The issue isn't whether Cellebrite was working properly. The issue is whether the [defendant's phone], which is itself a computer, was working properly at the time it generated a computer record." The State replied that the Cellebrite program generated the hexadecimal view: "The image shows the write-ahead log, and from everything that he reviewed, that that application within the device that's viewed was working properly." The trial court overruled the objection.

¶ 73 O'Sullivan described the text message database as having two parts. The primary database, what he called the SMS database, and "the WAL file that's attached to that database, and that's used for things such as redundancy, for crash recovery." The write-ahead log (WAL) is a temporary storage space that fills up with messages and then "push[es]" them "to the main database" before "writing over" the data when new messages are sent or received.

¶ 74 O'Sullivan testified that he located two messages in the WAL that were not also in the primary database as "active files" and likewise were not contained in the Cellebrite timeline. If something was not an "active file," that meant it had been deleted.

¶ 75 O'Sullivan compared all the files in the WAL against the files in the primary database to determine when the delete messages were sent or received. The oldest file appearing in both places (the WAL and the primary database) was from November 16, and the newest was from November 25.

¶ 76 O'Sullivan then explained he compared the information Cellebrite placed in the timeline with the information in the Sprint records to make sure they were consistent. The Cellebrite timeline showed defendant's phone did not send or receive any text messages between 9:05 p.m. on November 24 and 6:57 a.m. on November 25, but the Sprint records showed five text messages—three inbound and two outbound, all exchanged with Gaddis's phone number—sent during that time. The difference between the two told O'Sullivan that the missing messages had been deleted. O'Sullivan stated that this discrepancy was similar to the two deleted messages he found in the hexadecimal view.

¶ 77 O'Sullivan opined it was probable that the messages he found were those missing from the Cellebrite timeline but included in the Sprint records. The State then showed the jury two exhibits that O'Sullivan explained were images of the hexadecimal view of the WAL. One of the texts in the WAL read, "You gotta piss on your right hand or use ammonia on your shirt and check your clothes for residues." The other stated, "And delete this after you read it and clean yourself up."

¶ 78 On cross-examination, O'Sullivan agreed he never examined the phone and could not say if it was working properly. However, he could "say that there doesn't appear to be any inconsistencies in the write-ahead log that makes me think there is a problem with it or the database." Although he agreed it was "possible," O'Sullivan stated, "by considering the Cellebrite data, the recovered text, along with the report, I'd say it's highly improbable that those [deleted

texts] were never received on the phone."

¶ 79                          D. Defendant's Case-in-Chief

¶ 80                          1. *Defendant's Witnesses*

¶ 81          Defendant called two neighbors who lived on North Griffin Street, behind the Clarence Street apartments, on the night of the murder. One neighbor raised and trained German Shepherds to be police dogs and had done so for 20 years. In the middle of the night, the dogs woke up their owner by barking in a distinctive manner that he had only heard once before when he caught an intruder trying to break into his house. (The owner trained the dogs to bark at strangers.) The owner checked outside but did not see anyone.

¶ 82          Another neighbor testified the dogs woke her up around 1:30 a.m. on November 25. She stated it was the first time she had ever heard them bark at night and that she had never heard them bark with such intensity the entire year she lived there. She, too, did not see anyone outside. Both neighbors told the police about this unusual behavior the next day after Newbern's body had been discovered.

¶ 83          Todd Weidenburner testified he was the owner of the apartment complex at 1227 Clarence Street in 2014. In the summer of 2014, Weidenburner got a call to help with a wellness check at Newbern's apartment because (1) a window was broken, (2) the door was locked, and (3) there was no response from inside. When Weidenburner arrived, the door was open, and Newbern was outside with his hand and arm bleeding. Weidenburner learned that Newbern hurt his arm punching out the window after being locked out. Defendant arrived a little later "to see about all the commotion" and spoke with Newbern. Newbern's wounds had not been bandaged, and the two stood somewhat close together. Weidenburner stated there was a fair amount of blood including on the window and dripping onto the sidewalk.

¶ 84                        *2. Defendant's Testimony*

¶ 85         Defendant testified that in November 2014 he had been living in apartment 2 at Clarence Street with Kindle for two years. Defendant became friends with Newbern as soon as Newbern moved into the complex. The two hung out every day after defendant got done working a shift at Mervis, mainly drinking and listening to music. Defendant stated they did not really "argue," instead characterizing it as "debate," and denied ever physically fighting Newbern.

¶ 86         Defendant also testified about the incident Weidenburner discussed. Defendant said he arrived home after work and saw two people standing outside of Newbern's apartment who asked defendant to get hold of Newbern because he was not responding. Defendant noticed the door was locked and window was broken. Assuming Newbern was asleep in the back of the apartment, defendant knocked very hard, and Newbern, seemingly intoxicated and sleepy, came out shortly. They shook hands and gave each other a quick shoulder-to-shoulder hug, which they did every time they met. Defendant then realized Newbern was bleeding, and Newbern explained he broke the window after locking himself out. Defendant did not think he got any blood on him.

¶ 87         Defendant testified he worked at Mervis Industries since 2010 as a "line captain," sorting and separating various metals that came through the line for further processing. Defendant stated he frequently saw spent shell casings in various sizes, various gun parts, and on at least one occasion an entire revolver. Defendant moved the materials by hand and always wore gloves. Defendant wore his work uniform home and sometimes wore his gloves while driving depending on the weather. Mervis gave employees a new pair of boots every year. Defendant stated he never cleaned them because he worked outside and they would just get dirty again. For similar reasons, defendant did not clean the interior of his car.

¶ 88         On November 24, 2014, defendant arrived home from work and met Newbern, who

was standing outside. Shortly thereafter, the two purchased some vodka and returned to Newbern's apartment to drink. Defendant remembered Scott was present for some amount of time but did not remember when or why she left.

¶ 89    Defendant stated that at some point he realized he needed to go back to his apartment to see Kindle. Defendant said the two would frequently "get into it" over his drinking. She did not like his drinking and wanted to spend more time with him. Defendant said he was an alcoholic and chose drinking first.

¶ 90    Newbern walked defendant to the door when defendant left. Defendant remembered hearing Newbern lock the deadbolt behind him when defendant left because defendant had the same door and had to make sure the screen door closed. Newbern always locked the door after defendant left.

¶ 91    Defendant denied shooting Newbern and testified that Newbern was alive and uninjured when he left. Defendant said he got in his vehicle and left. Defendant stated he remembered getting lost and driving around but did not really remember going to Chicago. Defendant said "there's been a lot of times" when he had been drinking that people would tell him he did things he did not remember doing. Defendant said he did not know where he was, did not realize he was in Indiana, and remembered being on a long road that did not have any exits for a long time. Defendant remembered pulling into a gas station and getting help from some security guards who put directions onto defendant's phone and told him to follow the instructions. Defendant did just that and ended up back in Danville.

¶ 92    When defendant got back to Danville, he parked his car in his usual spot and noticed the police were all around. He saw Kindle arrive in her car around the same time. Defendant cooperated fully with the police, giving them permission to search his car and even take the clothes

he was wearing.

¶ 93 On cross-examination, the State asked why defendant lied to the police by telling them he did not have an argument with Newbern over a speaker. Defendant respondent that he did not lie and there was no argument. Defendant maintained that he gave Newbern the speaker and Newbern paid him for it with music and movies that Newbern "made." Defendant took the speaker back at one point before they agreed Newbern could pay defendant in music and movies. Defendant then gave the speaker back.

¶ 94 Defendant insisted that he did not argue with Newbern the night he was murdered because the speaker had already been paid for. When asked if Scott was lying when she testified to the contrary, defendant said she was.

¶ 95 Defendant stated he did not remember leaning up against his car or speaking with Kindle. He was not sure if he drank all of the vodka with Newbern or if he drank more alcohol later that night.

¶ 96 Defendant did not remember speaking to Gaddis that night. Defendant denied knowing his way around Chicago or telling the police he knew how to get back to Danville from Chicago. Defendant stated he drove around drunk and got lost on the night in question. Defendant remembered that he got lost in Danville but did not remember any of the places he went to or roads he drove on that night. Defendant stated he called 911 while it was dark outside and that the security guards put the directions in his phone when it was light outside.

¶ 97 Defendant agreed that he sometimes forgets when he drinks a lot and that he drank a lot on that day.

¶ 98 E. Closing Argument

¶ 99 The State began and ended its closing argument by paraphrasing the text messages

between Gaddis and defendant: "Piss on your hand, 'use ammonia on your shirt, delete this message, clean yourself up, check your clothes for residues.' " The State argued that these messages could only be about defendant asking for help cleaning up after the murder. The State further contended that Newbern had been dead "a long time" because, when he was found, "[h]e's cold to touch. The blood has left his skin. He's got ashen skin, and he's suffering from rigor mortis." The State's theory was that Newbern died between 6:30 and 9 p.m. when defendant was still in Danville.

¶ 100        During the State's argument, the following exchange occurred:

"Look at all the evidence together and see what makes sense. Don't just keep all the pieces separate.

Now I can't prove this case without any doubt—

MS. MEENTS [(DEFENSE COUNSEL)]: Objection; misstating what he has to prove.

THE COURT: I'm going to sustain that objection.

MR. BRYANT [(THE PROSECUTOR)]: There's no way to remove all doubt. The only way to know without any doubt is to be a witness.

MS. MEENTS: Objection, again.

THE COURT: Okay. I'm going to sustain the objection. Counsel may argue, but arguments of lawyers will not to [*sic*] be taken as statements of law. Instructions on the law will come from me after final arguments are completed. Go ahead.

MR. BRYANT: The law is I have to prove this case beyond a reasonable doubt. I can't define what reasonable doubt is. Each of you determines what you

think reasonable doubt is. When you know in your head and in your heart what the truth is, then you've found beyond a reasonable doubt.

MS. MEENTS: Objection, again, misstating the law and trying to define reasonable doubt.

THE COURT: Sustained.

MR. BRYANT: When you're looking at all this, don't just consider what's possible. Consider what's probable. Look at it all together. What makes sense? Everyone in this courtroom could have possibly been the person that murdered William Newbern. Who in this courtroom does the evidence point to and show is probable? That's what you need to look at.

MS. MEENTS: Objection. He's lowering the burden, Your Honor.

THE COURT: Sustained."

¶ 101      The State concluded by arguing the forensic evidence—the GSR, Newbern's blood on defendant's boot, the cell phone data—all pointed to defendant's guilt, which was the most "probable" explanation for Newbern's murder.

¶ 102      In his closing argument, defendant emphasized that the forensic evidence was entirely consistent with defendant's testimony and therefore was not incriminating. Defendant further pointed out that he fully cooperated with the investigation by turning over to the police his phone, car, and even the clothes he was wearing. Defendant relied heavily on his alibi—and the cell tower data confirming it—to show that someone else murdered Newbern, likely in the middle of the night when the dogs started barking. Regarding time of death, he argued, "Dr. Bao told you there's no time of death. He could not tell you a time of death. So what time someone saw rigor mortis in the morning does not matter, because Dr. Bao said you cannot tell time of death."

¶ 103                    F. The Jury's Verdict and Posttrial Matters

¶ 104          The jury found defendant guilty of first degree murder. In a posttrial motion,

defendant argued that the trial court erred by admitting the text messages and Lawson's opinion

that the body had rigor mortis. Defendant also argued that the State made improper closing

arguments that prejudiced defendant. Defendant did not make an argument that the court erred by

permitting the State to elicit testimony about defendant's possessing a gun earlier in 2014. The

trial court denied the motion and later sentenced defendant to 60 years in prison.

¶ 105          This appeal followed.

¶ 106                              II. ANALYSIS

¶ 107          Defendant appeals, arguing (1) the trial court erred by admitting into evidence

deleted text messages recovered from defendant's phone, (2) the trial court erred by admitting

other crimes evidence that defendant possessed a gun unrelated to the shooting, (3) the trial court

erred by admitting expert opinion testimony from a witness that Newbern was found with signs of

rigor mortis, (4) the State's closing argument was improper in that it attempted to lower the burden

of proof, and (5) defendant was denied the effective assistance of counsel for counsel's failure to

adequately prevent these errors. We disagree and affirm.

¶ 108          A. The Admissibility of the Text Messages and Related Testimony

¶ 109          Defendant first argues that the trial court erred by reconsidering its pretrial ruling

denying the State's motion *in limine* to present (1) the content of deleted text messages sent by

Gaddis to defendant on the night of the murder and (2) expert testimony relating to the recovery

of those messages. Defendant asserts three bases to support his contention that the trial court erred:

(1) the State failed to lay an adequate foundation for the text messages because they were computer

generated records, (2) the messages were hearsay and not subject to any hearsay exception, and

(3) the trial court's reversal of its order *in limine* on the second to last day of trial violated defendant's due process rights, pursuant to *People v. Patrick*, 233 Ill. 2d 62, 908 N.E.2d 1 (2009). We address these arguments in turn.

¶ 110                                    1. *The Standard of Review*

¶ 111          The appellate court reviews a trial court's decision to grant or deny a motion *in limine* for an abuse of discretion. *People v. Nepras*, 2020 IL App (2d) 180081, ¶ 20, 157 N.E.3d 1151. "A trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the trial court's view." *Id.* ¶ 21. A reviewing court also applies the abuse of discretion standard to a trial court's determination (1) of the authenticity of an item and (2) whether an adequate foundation has been laid for a piece of evidence. *People v. Taylor*, 2011 IL 110067, ¶ 27, 956 N.E.2d 431.

¶ 112                              2. *Foundation for the Text Messages*

¶ 113          Defendant argues that the State failed to lay a sufficient foundation for the admission of the text messages. Defendant contends that because the text messages were computer generated records, to lay a proper foundation the State needed to prove that the cell phone from which the texts were recovered was working properly.

¶ 114                                       a. The Law

¶ 115          The Second District recently discussed the foundational requirements for the admission of text messages in *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51, 100 N.E.3d 635, and wrote the following:

> "As to a proper foundation for admission, text messages are treated like any
> other form of documentary evidence. [Citation.] A proper foundation is laid for the
> admission of documentary evidence when the document has been identified and

- 25 -

authenticated. [Citation.] Authentication of a document requires the proponent to present evidence that the document is what the proponent claims it to be. *Id.*; see also Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). *** The court's 'finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied.' [Citation.] *** [T]he issue of the document's authorship is ultimately for the jury to determine."

¶ 116    "The proponent need only prove a rational basis upon which the fact finder may conclude that the document did in fact belong to or was authored by the party alleged." *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 36, 25 N.E.3d 1189. "The trial court, serving a limited screening function, must then determine whether the evidence of authentication, viewed in the light most favorable to the proponent, is sufficient for a reasonable juror to conclude that authentication of the particular item of evidence is more probably true than not." *Id.*

¶ 117    "Authentication of a document may be made by direct or circumstantial evidence, which is routinely the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be." *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86, 81 N.E.3d 578. "Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances." *Ziemba*, 2018 IL App (2d) 170048, ¶ 52. "Documentary evidence, therefore, may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author." *Id.*

¶ 118	In *Kent*, the Second District provided the following nonexhaustive list of factors for a trial court to consider when determining if a party has made a *prima facie* showing of authentication:

> "(1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or (6) other circumstances peculiar to the particular case may suffice to establish a *prima facie* showing of authenticity." *Kent*, 2017 IL App (2d) 140917, ¶ 118.

We note that the Illinois Supreme Court recently cited with approval these six factors in *People v. Brand*, 2021 IL 125945, ¶ 44.

¶ 119	b. This Case

¶ 120	In this case, it is helpful to distinguish between the *content* of the text messages and the evidence of the *deleted* messages. The content of the messages was authenticated by Gaddis, who testified that he remembered texting defendant in the middle of the night and telling him to clean up. When confronted with the exact statements of the text messages he allegedly sent, Gaddis stated he believed those statements were accurate.

¶ 121	Although Gaddis qualified his testimony by claiming he could not remember

- 27 -

exactly, he thought the statements were correct. Gaddis's supposed uncertainty goes to the weight of the evidence, not its admissibility. Gaddis essentially testified that, as far as he could remember, the text messages read by the State were consistent with what he sent defendant on the night of the murder. Accordingly, the content of the text messages was properly authenticated.

¶ 122 Defendant argues that Gaddis's testimony was not enough, given his professed lack of memory. Defendant further contends that the State needed to authenticate the text messages with information from both the sender and the receiver. However, we agree with *Ziemba*, which held that the testimony of the author of the text message is generally sufficient to authenticate it. *Id.*

¶ 123 We note that the State also introduced defendant's cell phone records from Sprint. Gaddis testified that his cell phone number was the same as the number listed on the records as the sender of three of the messages that were deleted from defendant's phone. Additionally, only Gaddis and defendant knew the contents of the text messages that were sent. Gaddis's agreement with the State when confronted with the wording was another factor in favor of authentication. And the message originated at 4:43 a.m., a time when one could expect Gaddis to be in sole possession of his phone.

¶ 124 3. *O'Sullivan's Testimony Regarding the Deletion of the Text Messages*

¶ 125 Because Gaddis authenticated the text messages, O'Sullivan's testimony was relevant for the fact that the messages were deleted. Alternatively, O'Sullivan laid a sufficient foundation for the admission of the deleted texts.

¶ 126 a. The Law

¶ 127 " 'Evidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt.' " *People v. Abernathy*, 402

Ill. App. 3d 736, 753, 931 N.E.2d 345, 358 (2010) (quoting *People v. Spaulding*, 309 Ill. 292, 304, 141 N.E. 196, 201 (1923)); see also *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 96 ("the evidence demonstrated that defendant deleted the incriminating text-message exchange *** from his cell phone before he provided it to the police").

¶ 128    "[W]hen expert testimony is based upon an electronic or mechanical device *** the expert must offer some foundation proof as to the method of recording the information and proof that the device was functioning properly at the time it was used." (Internal quotation marks omitted.) *People v. Thompson*, 2017 IL App (3d) 160503, ¶ 13, 84 N.E.3d 565. "The expert must show that the electronic or mechanical device was in good working order when it was used by explaining how the machine is maintained and calibrated and why the expert knows the results are accurate." *Id.* "Such proof is necessary to ensure that the admission of expert scientific testimony based upon a testing device is both relevant and reliable." *Id.*

¶ 129                                b. This Case

¶ 130    The relevant "machine" used by O'Sullivan to do "testing" was the Cellebrite software operating on the FBI computer. O'Sullivan testified that his equipment was regularly tested and validated to ensure it was giving accurate results. O'Sullivan further testified that (1) the FBI validates all versions of Cellebrite, which was used here to extract the data on the USB drive he reviewed, and (2) that data was extracted properly from the phone.

¶ 131    He also explained that he compared the information recovered from the phone against other documents to ensure accuracy. Specifically, he validated the WAL by checking its contents against the contents of the text message database and locating all the existing texts in both places. O'Sullivan then compared what Cellebrite was showing him against the Sprint records to ensure the information he was analyzing was accurate. O'Sullivan confirmed that the hash value

was the same. Based on his experience and training, O'Sullivan saw nothing in the contents of the phone that would indicate to him the phone was not in proper working order. This evidence is sufficient to establish that, more likely than not, defendant's phone was working properly at the time the text messages were received.

¶ 132    Further, Lange and Wilson both testified that in November 2014, when they interviewed defendant, he showed them his phone to demonstrate that he had called 911 as well as other people the night of the murder. Wilson assisted defendant in looking through the call log to verify defendant's claims. Defendant never indicated to the police that his phone was not working properly, nor did he testify to that at trial. Defendant did consent to a search of his phone by the police for all of the data inside of it.

¶ 133    It is reasonable to infer from defendant's actions that he believed his phone was working the night of the murder because he (1) used it with such frequency, (2) showed it to the police to corroborate his description of events, and (3) willingly gave it to the police without mentioning any indication that the phone was not working properly. This inference is bolstered by the Sprint records and O'Sullivan's analysis. Taken together and viewed in the light most favorable to the State, the trial court could have easily concluded that the State had established a proper foundation for the deleted text messages.

¶ 134    Even if the State did not have all of this foundation testimony in front of the trial court at the time the court overruled defendant's objection, all of the relevant information needed to demonstrate an adequate foundation was later presented to the court and the jury. Accordingly, any error in the timing of the admission of the evidence was, at worst, harmless.

¶ 135                                    4. *Hearsay*

¶ 136    Defendant also asserts that the text messages were inadmissible hearsay and trial

counsel was ineffective for not requesting a limiting instruction. We disagree and conclude that the statements (1) were not "assertions" within the meaning of the hearsay rule and (2) were not offered for their truth.

¶ 137 Hearsay is an out of court statement offered to prove the truth of the matter asserted and is generally inadmissible. *People v. Neal*, 2020 IL App (4th) 170869, ¶ 80, 150 N.E.3d 984. A statement is not barred by the prohibition against hearsay if the statement is not offered for its truth but for some other reason, such as to show the effect on the listener's mind or to show why the listener undertook subsequent actions. *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 80.

¶ 138 The statement "delete this" was admissible as an out-of-court statement offered to prove its effect on the listener and to show why defendant subsequently acted as he did—that is, why defendant later deleted five—and only five—text messages from his phone, which were exchanged between him and Gaddis around 4:45 a.m. on November 25, 2014. See *People v. Sorrels*, 389 Ill. App. 3d 547, 553, 906 N.E.2d 788, 793 (2009). Further, the rest of the statements in the text messages gave context for defendant's actions (*cf. People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 49, 103 N.E.3d 1096 (statements helpful to give meaning to defendant's "answers, comments, behaviors—or even, at times, his silence")) and, by extension, showed defendant's state of mind—namely, that he believed the text messages were incriminating.

¶ 139 Even if not offered to prove defendant's subsequent conduct, the text messages were clearly commands and not statements of fact. "[C]ommands are generally not hearsay, because the significance is the command itself and there is no truth being asserted in a command." *Saulsberry*, 2021 IL App (2d) 181027, ¶ 81. In *Sorrels*, this court examined whether a command to "stop" was hearsay and wrote the following:

"However, no 'truth of the matter asserted' is present in a police officer's command

to 'Stop.' Nor is it necessary for the opposition to 'test the testimony's reliability through cross-examination of the out of court declarant' because that testimony has no 'reliability' in the hearsay sense. Instead, all that typically matters—as in this case—is whether the command 'Stop' was made. In this regard, testimony about the command is no different than testimony that a person sneezed, a door slammed, someone laughed or cried, or someone rang a bell." *Sorrels*, 389 Ill. App. 3d at 553-54.

¶ 140    In *Sorrels*, this court adopted the reasoning of the Court of Special Appeals of Maryland, which set forth the following:

"To qualify as hearsay, the words recounted in court must, for starters, constitute an assertion or statement of a fact. Many out-of-court utterances are self-evidently not assertions. If a witness testifies to the out-of-court inquiry, 'What time is it?,' that inquiry is obviously not an assertion of anything. *** An out-of-court assertion of a fact may be true or untrue. For that reason, its admissibility in evidence is problematic if offered to prove that fact. *** The out-of-court command, 'Stop!' can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem.

* * *

Many out of court utterances fall within such categories as greetings, pleasantries, expressions of gratitude, courtesies, questions, offers, instructions, warnings, exclamations, expressions of joy, annoyance[s], or other emotion[s], etc. Such utterances are not intended expressions of fact or opinion. They are not assertions, at least for the purposes of the hearsay rule. Thus, they are not hearsay.

'Hello.'

'How are you?'

'Have a nice day.'

'Would you like to have lunch?'

'I hope it doesn't rain tomorrow.'

'I wonder what he paid for that car.'

'Thank you.'

'Can you join me for a drink?'

'Don't do that, or else.'

'Watch your step.'

None of the above utterances is an intended expression of fact or opinion. None is hearsay." (Internal quotation marks omitted.) *Id.* at 554.

¶ 141 In this case, the State did not offer Gaddis's text messages to prove that defendant "need[ed] to piss on [his] hand" or "delete this after [he] clean[ed] up." The State was offering the messages to demonstrate that (1) defendant asked Gaddis for advice about cleaning gunshot residue and (2) Gaddis believed the discussion was incriminating and should be deleted. Defendant's subsequent actions of deleting the messages (conduct that is likewise not assertive in nature although it can certainly be incriminating) support this assessment.

¶ 142 As is often the case with the question of whether a statement is hearsay, the trial court has discretion to determine whether the statement in question is being offered for the truth of what is contained therein or for a nonhearsay purpose. See *People v. Caffey*, 205 Ill. 2d 52, 89-90, 792 N.E.2d 1163, 1188 (2001). A trial court similarly has discretion to determine what fact, if any, is being asserted by implication through the statement. See *id.* In this case the court did not

abuse its discretion by overruling defendant's hearsay objection to Gaddis's statements.

¶ 143                                    5. People v. Patrick

¶ 144        Defendant contends that the trial court erred by reversing its ruling on the motion

*in limine* regarding the text messages at the end of trial. The case relied upon by defendant for this

contention, *People v. Patrick*, 233 Ill. 2d 62, 908 N.E.2d 1 (2009), is completely inapposite.

¶ 145        In *Patrick*, the Illinois Supreme Court held that "a trial court's failure to rule on a

motion *in limine* on the admissibility of prior convictions when it has sufficient information to

make a ruling constitutes an abuse of discretion." *Id.* at 73. The supreme court's holding was based

on the important constitutional interests at stake and the policy considerations attendant to those

interests. *Id.* at 69-70. The court concluded that a defendant's due process rights are inhibited

when, as in that case, a trial court declines to rule on a motion *in limine* on the admissibility of

prior convictions until after the defendant testifies because, in all but the most complicated of

cases, the trial court will have the information necessary to make a complete determination well

in advance of trial. *Id.* at 73.

¶ 146        The constitutional rights that were at issue in *Patrick* are simply not implicated by

the evidence at issue in the motions *in limine* in this case. Although the trial court's decision in

this case to reconsider and reverse its earlier ruling may have caused defendant to reevaluate his

trial strategy, the same would likely be true whenever a motion *in limine* in a criminal case is

reconsidered and reversed. If defendant's argument had any merit, then a pretrial ruling in a

defendant's favor on a motion *in limine* would be binding upon the trial court. That is not the law—

nor should it be.

¶ 147        We note that, although defendant claims he was prejudiced by the trial court's

change in its ruling, he does not explain how or what he would have done differently if the trial

court had not changed its ruling. Notably, defendant did not present any evidence relating to the text messages, nor does he claim to have been deprived of a chance to do so.

¶ 148     Defendant has not provided a single Illinois case—and we are not aware of any—extending *Patrick*'s holding to any other type of motion *in limine*. We emphatically reject his request to do so in this case, which involves nothing more than a trial court's reconsideration at trial of a typical pretrial order *in limine*.

¶ 149     Rulings on motions *in limine* are by definition interlocutory orders made based on an expectation of what will happen at trial. *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 147, 107 N.E.2d 938. They are "*always* subject to reconsideration during trial." (Emphasis in original and internal quotation marks omitted.) *People v. Gliniewicz*, 2018 IL App (2d) 170490, ¶ 32, 119 N.E.3d 28. Trial courts are even permitted to reserve ruling on motions *in limine* until the parties present the context for the identified evidence. *Zimmerman*, 2018 IL App (4th) 170695, ¶ 139 (citing *People v. Owen*, 299 Ill. App. 3d 818, 823-24, 701 N.E.2d 1175, 1178-79 (1998)). And trial courts always have the discretion to reexamine their prior rulings on motions *in limine* when the full context of the evidence at issue becomes more clear at trial.

¶ 150     B. The Prosecutor's Allegedly Improper Closing Argument

¶ 151     Defendant next argues that he was denied a fair trial because during closing argument the State (1) misstated the evidence concerning the time of Newbern's death and (2) attempted to lower its burden of proof and define reasonable doubt for the jury. We conclude that the trial court properly sustained defendant's objections and instructed the jury that argument from counsel is not the law.

¶ 152     1. *The Law Regarding Prosecutors' Closing Arguments*

¶ 153     Prosecutors are afforded wide latitude during closing arguments and may properly

comment on the evidence presented and reasonable inferences drawn therefrom. *People v. Jackson*, 2020 IL 124112, ¶ 82, 162 N.E.3d 223. However, a prosecutor may not (1) misstate the evidence, (2) argue facts not in evidence, or (3) make remarks for the sole purpose of inflaming the jury's passions or prejudices. *People v. Short*, 2020 IL App (1st) 162168, ¶ 76, 159 N.E.3d 425. When addressing claims of impropriety, reviewing courts "consider the closing argument as a whole, rather than focusing on selected phrases or remarks" and examine the challenged statements in the context of the entire closing argument. *Jackson*, 2020 IL 124112, ¶ 82; *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35, 129 N.E.3d 621.

¶ 154            "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. "A trial court can cure erroneous statements made during arguments by giving proper jury instructions on the law ***, telling the jury arguments are not evidence and should be disregarded if not supported by the evidence, or by sustaining an objection and instructing the jury to disregard the improper statement." *Kallal*, 2019 IL App (4th) 180099, ¶ 35.

¶ 155                                    2. *This Case*

¶ 156            Regarding the State's alleged misstatement of the evidence concerning time of death, for the reasons we explain later (*infra* ¶¶ 184-85), we conclude that the State permissibly argued reasonable inferences to be drawn from the evidence presented.

¶ 157            Regarding the State's allegedly lowering the standard of proof or defining reasonable doubt, we conclude defendant did not suffer any prejudice because the trial court (1) sustained defendant's timely objections, (2) instructed the jury at the time of the objection that closing arguments are not the law, and (3) properly instructed the jury on the applicable law. See

*Kallal*, 2019 IL App (4th) 180099, ¶ 35.

¶ 158 We earlier set forth the exact exchange from the State's closing argument about which defendant complains. *Supra* ¶ 100. That exchange demonstrates that the trial court sustained defendant's objections and offered a curative instruction to the jury after defendant's second objection. And the court correctly instructed the jury at the close of evidence that arguments of the parties are not evidence.

¶ 159 Regarding the State's request that the jury consider what was more "probable," we conclude that any such statements did not affect the jury's verdict because the court's proper instructions cured any prejudicial effects. We also note that, in the same portion of the prosecutor's closing argument of which defendant complains, the prosecutor did correctly address the State's burden of proof, stating "The law is I have to prove this case beyond a reasonable doubt. I can't define what reasonable doubt is. Each of you determines what you think reasonable doubt is."

¶ 160 It appears the State was attempting to tell the jury, albeit in ways the trial court concluded were objectionable, that it was not required to prove defendant's guilt beyond all doubt. Courts have consistently held that a prosecutor's saying his burden of proof is "not beyond all doubt" is not improper. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 64, 54 N.E.3d 183 (so holding and collecting cases). Nonetheless, prosecutors must be careful and precise when making such arguments, and they should also be mindful that an argument about their burden of proof is like dealing with the "third rail" of closing arguments. There is little room for error or misspeaking. Thus, prosecutors should use utmost care to not stray beyond the exact language accepted by the courts.

¶ 161 Although we conclude defendant was not prejudiced because the trial court corrected the errors, we deem the State's closing argument to be improper. Despite repeated rulings

by the trial court sustaining defendant's objections, the State continued to discuss its burden of proof in a fashion inconsistent with the court's rulings. Although the prosecutor clearly knew the proper statement of that burden and stated it to the jury, he then said, "When you know in your head and in your heart what the truth is, then you've found beyond a reasonable doubt." This argument was improper.

¶ 162     In *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶¶ 212-13, this court explained the options a trial court has when a party repeatedly engages in improper conduct and wrote the following:

> "[I]n a situation where a party continues with a line of questioning or argument after an objection has been sustained, a trial court can and likely should intervene, particularly, as here, when counsel's disregard of the court's ruling is so flagrant and repetitious. After all, it is the *trial court's* authority and control of the proceedings that the offending counsel has chosen to disregard.
>
> In appropriate circumstances, the trial court would be fully justified to take action to reduce any advantage that the offending attorney could gain as a result of his abusive behavior. For instance, the judge could calmly interrupt and *sua sponte* inform the jury as follows:
>
> > 'Attorney Smith has just ignored the court's ruling in which I sustained the [other party's] objection. When I sustain an objection, that means that the [question or comment] is improper, and you should not consider it when you retire to deliberate. To avoid the possibility of Attorney Smith's gaining an unfair advantage by disobeying my ruling, I trust that when you begin to deliberate, you will disregard Attorney Smith's

conduct.' "

¶ 163     Our suggestion from *Allen* is equally applicable to criminal cases, and we encourage trial courts to consider it as an option when dealing with repeated misstatements by *any* attorney in closing arguments, as occurred here.

¶ 164                    C. Evidence of Prior Bad Acts

¶ 165     Defendant next argues that the trial court erred by permitting the State to introduce testimony from two witnesses—Levingston and Kindle—that defendant possessed a gun within the years prior to the murder, contrary to defendant's statements to the police. Defendant contends this testimony was irrelevant, unfairly prejudicial, and constituted evidence of prior bad acts. The State responds that defendant forfeited the argument by failing to raise it in a posttrial motion and, assuming an error occurred, defendant cannot establish plain error because the evidence was not closely balanced. We agree with the State.

¶ 166                    1. *The Plain-Error Doctrine*

¶ 167     As an initial matter, we note that defendant did not properly preserve this issue because, although he objected prior to and during trial, he did not include it in his posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 ("Failure to do either [(object at trial or raise the error in a posttrial motion)] results in forfeiture.").

¶ 168     The Illinois Supreme Court recently explained the plain-error doctrine as follows:
            "A reviewing court will consider unpreserved error when a clear or obvious error
            occurs and (1) the evidence is so closely balanced that the error alone threatened to
            tip the scales of justice against the defendant, regardless of the seriousness of the
            error or (2) the error is so serious that it affected the fairness of the defendant's trial
            and challenged the integrity of the judicial process, regardless of the closeness of

- 39 -

the evidence. [Citation.] When a defendant fails to establish plain error, the result is that his procedural default must be honored." *People v. Jackson*, 2020 IL 124112, ¶ 81, 126 N.E.3d 223.

¶ 169    In *Sebby*, 2017 IL 119445, ¶ 53, the supreme court held that, "[i]n determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case."

¶ 170                    2. *The Evidence Was Not Closely Balanced*

¶ 171    We conclude the evidence was not closely balanced. The State found gunshot residue on defendant's clothes, in his car, and on his car's door handle. A drop of blood matching the victim was found on defendant's boot. Scott testified that defendant and Newbern were arguing when she left at 6:30 p.m. Defendant told the police that he was drunk and frequently blacked out when drunk. Experts placed defendant in Danville at the apartment complex between 6 and 9 p.m. based on cell phone records. Additionally, the text messages from Gaddis showed that defendant was contacting his brother for advice about how to clean up "residue," which the State argued referred specifically to gunshot residue. Defendant deleted five texts from his phone, including one instructing him to do so after he cleaned himself up. The texts show knowledge of the crime and suggest he was covering it up. O'Sullivan found all the other messages on the phone, which he knew because he compared the data to the Sprint records and only found five missing messages.

¶ 172    Defendant alternatively argues that counsel was ineffective for failing to object to the testimony on the basis that it constituted evidence of other crimes or prior bad acts. We are not persuaded.

¶ 173    Kindle's testimony about the last time she saw defendant with a gun actually supported his statements to the police. Kindle testified that she had been dating defendant for about

two years and, shortly after they began dating, defendant told her he had a friend's gun. Kindle told him she did not like guns, and he apologized. Kindle never saw defendant with a gun again. Based on Kindle's testimony, the last time defendant handled a gun was years before the murder.

¶ 174 Moreover, Kindle's testimony about defendant's possessing a gun was not a prior bad act. The jury never heard that defendant was not allowed to possess a firearm or that he was a convicted felon. The right to own a firearm, including a handgun, is fundamental and protected by the second amendment. See *District of Columbia v. Heller*, 554 U.S. 570 (2008). Testimony that defendant possessed a handgun in his home, on its own, cannot be considered a bad act.

¶ 175 Defendant has a stronger argument regarding Levingston's testimony, which could be viewed as problematic. Levingston's testimony included statements made by defendant indicating he (1) got into an altercation with the police, (2) threatened to kill himself, and (3) recklessly discharged a firearm outside the apartment complex with other people present. Such detail was not necessary to make the State's point—whatever that was—and risked unfair prejudice. Nonetheless, the trial court considered these issues and overruled defendant's objections. Given our deferential standard of review, we conclude the trial court did not abuse its discretion and any objection predicated on prior bad acts was either (1) implicitly considered by the trial court when making its ruling or (2) would not have changed the trial court's ruling.

¶ 176 D. Improper Opinion Testimony

¶ 177 Next, defendant argues that the trial court committed reversible error by overruling his objection and permitting Lawson to offer the opinion that he observed "obvious *** rigor mortis" when he examined Newbern's body on the morning of November 25, 2014. Defendant contends (1) "rigor mortis" is a specialized term that required expert testimony to relate to the jury and (2) the State did not provide the foundation for such testimony. Defendant also asserts the

State compounded the error by specifically arguing in closing that "rigor mortis" meant Newbern had been dead "a long time."

¶ 178    In response, the State first suggests that Lawson's observation of "rigor mortis" was a lay opinion based on personal observation. Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) provides the following:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶ 179    Lawson's statement that the body was suffering from "obvious" rigor mortis could have been considered a lay opinion. After all, Lawson did not explain what he meant by "rigor mortis," and the dictionary defines that term as "temporary rigidity of muscles occurring after death." Merriam Webster's Online Dictionary https://www.merriam-webster.com/dictionary/rigor%20mortis (last visited Nov. 17, 2021) [https://perma.cc/LKL8-CWRV]. A lay person's understanding of the term rigor mortis is a stiffness of a body that sets in after the person has died, and others testified that Newbern's body was cold and stiff.

¶ 180    We find support for this conclusion in *People v. Botsis*, 388 Ill. App. 3d 422, 442-43, 902 N.E.2d 1092, 1108 (2009), in which the First District concluded that two lay witnesses who observed a car crash were properly permitted to testify that the defendant was "obviously having 'a seizure' " based on their observations of the defendant "shaking, foaming at the mouth," and "convulsing repeatedly." The court noted that the witnesses were not attempting to offer a

medical diagnosis. *Id.* at 443.

¶ 181        However, in this case, the State offered Lawson's training and experience as foundation for his observation that Newbern's body had rigor mortis instead of simply rephrasing the question to have Lawson describe the body's condition.

¶ 182        In *People v. Novak*, 163 Ill. 2d 93, 100-03, 643 N.E.2d 762, 766-68 (1994), *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353, 848 N.E.2d 950 (2006), the Illinois Supreme Court agreed with the defendant that the trial court improperly let two witnesses testify as "lay witnesses" concerning whether the defendant's physical training methods were appropriate. Nonetheless, the supreme court concluded the testimony was properly considered by the jury because the State, unwittingly, laid the proper foundation for the witnesses to testify as experts. *Id.* at 104. The court wrote, "Through education, training, experience, or a combination of each, these witnesses possessed knowledge that is not common to the average citizen. Further, this knowledge aided the jury in reaching its conclusion." *Id.*

¶ 183        As was the case in *Novak*, Lawson's testimony was admissible as an expert opinion. Lawson was qualified based on his training and experience to offer testimony about signs that a person is dead, and he testified he was trained that rigor mortis is one of these signs.

¶ 184        Even if improperly admitted, the testimony was not prejudicial. Again, Lawson did not testify what "rigor mortis" meant at all, much less in a technical, medical sense. He further did not say how it occurred or whether it meant a person had been dead for any particular amount of time. In fact, Lawson disclaimed any knowledge about these latter subjects. By contrast, Bao testified that time of death could not be determined, even by highly trained pathologists, because there were too many factors that impacted the analysis. Indeed, Bao went so far as to say that anyone who claimed to be able to give time of death was dealing in "fiction."

¶ 185    Contrary to defendant's claims, the State was permitted to argue in closing that the circumstances in which the body was found indicated that it had been there for many hours. Multiple witnesses testified that Newbern's body was cold and stiff, and Lawson added that the body was "ashen" or gray. The State was relying on jurors' common experience of the difference between someone alive and someone who has been dead for many hours. It did not need expert testimony to support the inference it was asking the jury to make.

¶ 186                    E. Ineffective Assistance of Counsel

¶ 187    Last, defendant argues that he received ineffective assistance of counsel based on counsel's failure to appropriately respond to the errors we analyzed earlier. For instance, defendant claims counsel was ineffective for failing to (1) demand an explanation from the trial court for overruling defendant's hearsay objection to the text messages, (2) seek a limiting instruction for the texts, (3) object on the basis of prior bad acts when the State offered testimony relating to defendant's prior possession of a gun, or (4) include the gun testimony in a posttrial motion. Because we conclude that the trial court did not err by overruling defendant's objections and admitting the evidence about which defendant complains, defendant cannot establish the prejudice prong of *Strickland*, and we need not further consider his claims of ineffective assistance.

¶ 188                            III. CONCLUSION

¶ 189    For the reasons stated, we affirm the trial court's judgment.

¶ 190    Affirmed.

**No. 4-19-0043**

| | |
|---|---|
| **Cite as:** | *People v. Price*, 2021 IL App (4th) 190043 |
| **Decision Under Review:** | Appeal from the Circuit Court of Vermilion County, No. 15-CF-411; the Hon. Nancy S. Fahey, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Brian L. Josias, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Garson S. Fischer, Assistant Attorneys General, of counsel), for the People. |