2022 IL App (4th) 210590

FILED
December 15, 2022
Carla Bender
4th District Appellate
Court, IL

NO. 4-21-0590

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Pike County |
| CLAYTON G. WATTS, | ) | No. 20CF51 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Alan D. Tucker, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Presiding Justice Knecht concurred in the judgment and opinion.
Justice Doherty specially concurred, with opinion.

**OPINION**

¶ 1     On July 22, 2021, a jury found defendant, Clayton G. Watts, guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2018)) in connection with the sexual assault of L.W. The assault occurred after L.W. snuck out of her home to go driving with defendant, who had been drinking alcohol and had made suicidal statements.

¶ 2     On appeal, defendant contends the trial court erred when it (1) admitted propensity evidence under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2020)) of three other sexual assaults of young women who had also met defendant and rode in a vehicle with him when he had been drinking; (2) admitted testimony from

defendant's former girlfriend stating defendant had made statements about self-harm to manipulate her; (3) admitted evidence of memes found on defendant's phone indicating beliefs it was appropriate to sexually assault incapacitated women; and (4) committed cumulative error. To the extent defendant forfeited issues for review, he contends plain error and ineffective assistance of counsel apply. We find no error. Accordingly, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In April 2020, the State charged defendant in connection with the November 21, 2019, sexual assault of L.W., who was 14 at the time of the offense. Defendant was 21 at that time.

¶ 5                          A. L.W.'s Assault and Propensity Evidence

¶ 6        At the preliminary hearing, sheriff deputy Chastity Anderson testified she observed L.W.'s interview conducted by a Child Advocacy Center employee. In the interview, L.W. stated she knew defendant as a family friend. He previously dated her cousin, and after they split up, her father befriended defendant, helped him, and treated him like family. On November 21, 2019, defendant sent L.W. messages she believed were suicidal, and he asked L.W. to meet him. Between 11 p.m. and midnight, L.W. snuck out of her house to meet defendant. She could tell he had been drinking. The interviewer did not ask L.W. if she had anything to drink.

¶ 7        Defendant and L.W. drove around and talked. L.W. stated she could tell defendant was "coming on to her," but she did not think it would go any further than that. L.W. asked defendant to take her home, and he stopped the vehicle at the end of her driveway, which was very long. Defendant asked L.W. to wait, prevented her from exiting the vehicle, and then forced himself on top of her. She tried to scream, but he covered her mouth. Defendant took off L.W.'s pants and underwear, rubbed his genitals on her thigh, put a condom on, and penetrated her vagina with his penis. L.W. told him to stop and told him "[y]ou don't want to do this." L.W. reported

defendant was "not able to finish" and became aggravated. L.W. quickly dressed herself and got out of the vehicle. Defendant told her "[l]ove you lots," and the next day, he sent a message stating "[t]hanks for a great night." L.W. took a long shower after the incident and did not report it until March 2020, when she spoke to a school counselor about it.

¶ 8        The State filed a motion *in limine* seeking to introduce evidence under section 115-7.3 of the Code to show defendant's propensity to commit sexual assault. The evidence consisted of three previous instances in which defendant allegedly sexually assaulted three different women, M.M., D.C., and J.N. Separate hearings were held regarding each of the allegations.

¶ 9        At the first hearing, M.M. testified defendant was a friend of her husband, Trevor, and he frequently stayed at their house. On Friday, October 18, 2019, Trevor was at work, and M.M., who was 23 at the time, went out drinking at two different bars with defendant and two other men, Kenny Little and Chase Howland. She became intoxicated and did not remember arriving at the second bar, but remembered defendant drove her home after the bars closed. She could not remember anything else about the night. When M.M. woke up the next morning, Trevor was in her bed, and defendant was in the spare bedroom. M.M. testified she felt "dirty" in her vaginal area when she woke up, like she had not cleaned up properly after sexual activity. She described the feeling as "sticky" and "like semen." M.M. knew she did not have sex with Trevor, as he did not arrive home until after 7 a.m., and she was not severely drunk at that time. Around Tuesday or Wednesday she thought about that feeling and had a memory of defendant on top of her with his hand on her stomach, breast, and vaginal area. M.M. did not tell Trevor about the incident until the allegation about J.N. came out.

¶ 10        At the second hearing, D.C. testified she dated defendant for a couple of months approximately two years earlier. They were intimate at that time, but then D.C. did not see defendant again until May 2018 when she saw him at a party. She was 20 years of age at that time. Defendant then texted D.C. and asked if she wanted to "hang out." D.C got in a vehicle with defendant and two other men, Jaime Howland and Hayden Kessinger, and they drove around on back roads drinking alcohol and became intoxicated. They stopped for bathroom breaks and once for D.C. and Jaime to swim in a river, where she stripped down to her bra and underwear to swim. The men then dropped D.C. off at her house.

¶ 11        About 10 minutes later, defendant texted D.C. and asked her to come over to his father's house, where he lived. D.C. was very intoxicated but could remember what happened. She testified she went to defendant's room, and defendant and Jaime were on defendant's bed wearing boxer shorts. She remembered laying in between defendant and Jaime on the bed and defendant kissed her. She felt Jaime force his fingers inside of her and then she blacked out. When she woke up, she did not have pants or underwear on, and defendant and Jaime were standing in front of the bed pulling up their pants. Defendant told D.C. she had to leave before his sister got there, and she got dressed and left. When D.C. arrived home, she used the bathroom and discovered she was bleeding, which she believed was caused by forced trauma. The next day, defendant called her and asked if she told her mother what happened. Defendant told D.C. she "was down for it," and D.C. told him she "was not down for it" and she consented to hanging out with him but did not consent to him touching her body. Defendant asked D.C. if she told her mother he raped her, and D.C. said "no." She testified she viewed rape as pinning someone down and using force and, at that point in time, she had no idea what had happened. Defendant kept trying to get D.C. to agree she did not say "no" or "stop" to him. D.C. later learned defendant recorded the conversation. D.C. sought

medical attention a couple of days later, and a rape kit was performed, but D.C. had not received the results.

¶ 12      At the third hearing, J.N. testified she knew defendant through friends and her brother, Brenton. Around October 30, 2019, when she was 19 years of age, defendant sent J.N. a Snapchat message asking her if she wanted to "road trip." J.N. met defendant and two others, Brenton and Daniel Howland. The group drove around on back roads drinking alcohol. J.N. testified they were very intoxicated. J.N. stated she weighed around 135 pounds and estimated she consumed about 10 beers. After about three hours, the group went to Daniel's house. Eventually Daniel stayed home, and Brenton went to an apartment he shared with his girlfriend. J.N. went with defendant where she "crashed at his house that night," with the idea defendant would drive her home in the morning.

¶ 13      J.N. laid down in defendant's bed. Defendant asked her for a kiss, and she testified: "I did give him a kiss on the lips. It was not a make-out kiss." She then fell asleep, wearing a shirt, sweatshirt, underwear, and leggings. J.N. later woke up without pants on. A phone light was shining on her bottom half, and defendant was trying to insert his penis into her vagina. He then penetrated her without her consent. J.N. asked "[w]hat the f*** are you doing?" Defendant pretended he was asleep, and she shoved him. While J.N. found her pants and got dressed, she repeated her question and began yelling at defendant, who said "[w]hat are you talking about?" Defendant seemed confused and asked her to be quiet. Defendant's sister knocked on the door, asked what was going on, and offered J.N. a ride home. J.N. declined and walked to Brenton's apartment. She told Brenton and his girlfriend what happened and called the police. She had a vaginal swab at the hospital as part of a sexual assault kit. Test results indicated a "likely match" to defendant. J.N. stated she did not feel defendant forcefully tried to rape her, but she felt very

violated because she did not give him consent. She admitted she once previously stayed with defendant after drinking and engaged in consensual sex with him.

¶ 14 Zack Orr, chief deputy with the Pike County Sheriff's Office, testified he reviewed text messages from defendant's phone and found messages from defendant's father sent in the early morning of October 30, 2019, asking "[w]hat's going on?" and "[w]ho is it and why is she crying so much?" Defendant responded, "I don't even know." Defendant's father gave a statement to a police deputy and said he heard yelling but did not see anybody.

¶ 15 The trial court heard arguments concerning the propensity evidence and took judicial notice of the preliminary hearing. In a written order, the court found the evidence relevant and admissible for showing propensity. The court further determined the probative value of the evidence was not substantially outweighed by its risk of unfair prejudice. The court discussed the evidence at length. The court noted the proximity in time of the incidents and found sufficient similarities between them. In particular, the trial court found the women were familiar with defendant, considered him a friend, and were comfortable being around him socially or being alone with him. In each situation defendant consumed alcohol and drove "around the countryside for a few hours" in a vehicle with the victim before the assault. The court also found each of the adult women was intoxicated and unable to give consent, while L.W. was unable to consent because of her age, and the incapacitation of the women, "either by age or intoxication" was known to the defendant. The court found the differences among the assaults insufficient to be fatal to admissibility of the evidence.

¶ 16 Shortly before trial, the defense sought to bar additional evidence concerning DNA results, which defendant said was disclosed at a late date and would lead to a "mini-trial" of the issue of J.N.'s assault. In response to the State's request, the trial court expressed the following

concern: "[i]f you want it in we'll let it in but I think you're going to lose your jury. You're going to be going down the rabbit hole here but that's just my opinion." The trial court ultimately allowed the additional evidence.

¶ 17     At trial, L.W. testified consistently with her pretrial testimony but added details as to how she knew defendant. L.W. testified defendant had mostly communicated with her on Snapchat and he would remove her from social media anytime he had a new girlfriend, telling her his girlfriend did not like her. She said when defendant had been drinking, he would become sad and say he could hurt himself. He previously had asked L.W. to sneak out and meet him, but she refused. According to L.W, on the night of the assault, defendant "was saying some really weird stuff worse than usual about how he could hurt himself and how he could get stuff to hurt himself." He told L.W. he needed to see her, and she agreed. However, as L.W. testified, defendant made no further statements about self-harm once she was in his car. She said, "[i]t was just kind of like the subject just disappeared." L.W. also confirmed she did not drink alcohol that night. The day after the assault, when defendant messaged L.W. on Snapchat stating "[t]hank you for a great night," L.W. did not respond and removed defendant from all social media.

¶ 18     M.M., D.C., and J.N. also generally testified consistently with their pretrial testimony. D.C. added she received the results of her sexual assault kit, which found no male DNA. M.M. admitted she shared defendant's exhibit 2, consisting of social media post that read: "In the girl's group chat like teehee so which innocent man should we all accuse of sexual misconduct today!? We'll probably get death threats, ppl saying we're lying whores, our nudes leaked, address' doxed, and careers ruined but haha what a fun prank[.]" M.M. stated the post was sarcastic and intended to highlight how bad it was to be a victim of sexual assault, especially once it becomes known by the public.

¶ 19 Additional witnesses testified at trial to corroborate the propensity evidence. For example, D.C.'s sister testified she saw blood in the toilet and D.C. crying on the night defendant assaulted D.C. Little testified about meeting M.M. with defendant. Trevor testified he did not have sex with M.M. on the night of her assault. Defendant's father testified about his text messages to defendant on the night of J.N.'s assault. Brenton testified J.N. told him defendant raped her, and he and his girlfriend called the police and went to the hospital where J.N. was examined. The officer who transported J.N. to the hospital and the nurse who performed an examination also testified. A DNA expert testified about the test results.

¶ 20 B. Evidence of Statements Concerning Self-Harm

¶ 21 Before trial, the State filed a motion *in limine* seeking to admit testimony from L.W.'s cousin, Madelyn, who would testify she previously dated defendant and he frequently threatened self-harm to get her to do something he wanted. For example, every month or two Madelyn would confront defendant about his cheating, alcohol consumption, or toxicity of the relationship, and defendant would respond by threatening to harm himself. Madelyn would then feel bad for him, and they would end up staying together. The State argued the evidence was relevant to show defendant's "opportunity, preparation, plan, knowledge, and absence of mistake or accident, in that he purposefully orchestrated the events that led to [L.W.] agreeing to sneak out of her home, and then he committed a sexual assault against her." Defense counsel argued the evidence was not presented at the hearings concerning propensity evidence and could not be used to prove *modus operandi*, which required greater similarity between the incidents.

¶ 22 The trial court found the evidence was used to show context why L.W. met defendant on the night of her assault. The court noted it did not find the evidence particularly harmful, as L.W. was already going to testify about statements of self-harm. The court also said it

would keep the matter "on the short leash" and limited it to the context of why L.W. met with defendant. At trial, Madelyn's testimony on the matter was brief and consistent with the facts as set forth in the State's motion.

¶ 23                      C. Evidence of Memes on Defendant's Phone

¶ 24          The State also filed a motion *in limine* seeking to present memes found in a data extraction from defendant's phone. The memes were created and modified on the phone on October 22, 2019, four days after the alleged incident with M.M, eight days before the alleged incident with J.N., and just under one month before the sexual assault of L.W. The memes were three photos with accompanying text, which the State argued expressed "the idea that a male has a right to have sexual relations with a female who is not consenting or who is unable to give consent."

¶ 25          The first meme was a series of five photos depicting two men arguing, with the accompanying text:

> "[MAN 1]: Why did you have sex with her?
>
> [MAN 2]: She was lying there naked, what was I supposed to do?!
>
> [MAN 1]: The autopsy, the f*** autopsy!
>
> [MAN 2]: Don't tell me how to do my job!
>
> [MAN 1]: You are the worst vet on earth!"

¶ 26          The second meme depicted a photo of a sleeping woman, who appeared to have Down syndrome and whose upper body was bare. The accompanying text stated: "Women are like parking spots[.] Usually, the best ones are taken…so when no one is looking—stick it in the disabled one."

¶ 27    The third meme depicted a photo of the actor Tom Cruise laughing with the text: "When she says don't cum in me, but you already did five minutes ago and are smashing her with a floppy."

¶ 28    The State argued the memes were admissible under section 115-7.3 to show propensity and admissible to show defendant's state of mind and knowledge that certain females did not consent to his sexual advances. Based on the content of the memes and the proximity in time of their creation to several of the assaults, the trial court found they were relevant to defendant's state of mind.

¶ 29    At trial, the parties stipulated to the chain of custody of defendant's phone. Orr testified about the extraction process of items on defendant's phone. Each meme was "created" and "modified" with the same time stamp, and each listed the source file as defendant's phone. The memes were created and modified within minutes of each other and within a matter of seconds to a text message conversation between defendant and Claire Stein, who was defendant's girlfriend at the time. Defense counsel objected, arguing Kyle Chumley, the detective who prepared the extraction report, had not yet testified to give full foundation. The court stated counsel could renew the objection if Chumley testified. When Chumley did so, he provided additional details about the extraction process. The record does not show an additional objection about foundation.

¶ 30    Stein testified and identified texts she exchanged with defendant on October 22, 2019. She also testified defendant was a member of a group chat that exchanged memes and videos. However, she had not seen the memes that were recovered from defendant's phone.

¶ 31         D. Additional Evidence, Verdict, and Posttrial Motion

¶ 32    A total of 19 witnesses testified over three days. In addition to law enforcement testimony, L.W.'s testimony, and testimony from the witnesses who were subject to motions

*in limine*, L.W.'s parents testified. L.W.'s mother stated L.W. lacked social skills and suggested L.W. "may be on the spectrum somewhere." In a video interview with Orr, defendant denied the allegations.

¶ 33        The jury found defendant guilty of both charges. Defendant filed a motion for a new trial, arguing newly discovered evidence in the form of a cell phone used by defendant that allegedly contained evidence defendant was with Stein around the time frame of the alleged sexual assault on L.W. He also included an affidavit from Stein recanting part of her testimony. He raised no issues regarding evidentiary rulings at trial. The trial court denied the motion. The court merged the convictions and sentenced defendant to 10 years' incarceration. This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35        Defendant contends the trial court abused its discretion in allowing propensity evidence, allowing evidence of his previous statements of self-harm, allowing the memes into evidence, and committing cumulative error.

¶ 36        Initially, we note the State argues defendant has forfeited review of the issues on appeal because he failed to raise them in his posttrial motion. A defendant must object at trial and raise the issue in a posttrial motion to preserve an issue for review. *People v. Hestand*, 362 Ill. App. 3d 272, 279 (2005). "We require this of defendants because failure to raise the issue at trial deprives the circuit court of an opportunity to correct the error, thereby wasting time and judicial resources." *People v. Jackson*, 2022 IL 127256, ¶ 15. However, defendant argues the errors amount to plain error and his counsel was ineffective for failing to preserve them. Illinois's plain error rule "is a narrow exception to forfeiture principles." *People v. Moon*, 2022 IL 125959, ¶ 21.

> " 'The plain-error doctrine allows a court to disregard a defendant's forfeiture and consider unpreserved error in two instances: "(1) where a clear or obvious error

occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." ' " *People v. Logan*, 2022 IL App (4th) 210492, ¶ 70 (quoting *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 16).

Forfeiture may also be set aside when a defendant contends trial counsel was ineffective for not preserving the error. *People v. Collins*, 2021 IL App (1st) 180768, ¶ 32. Such a claim requires counsel to have made an objectively unreasonable decision resulting in prejudice to the defendant. *Collins*, 2021 IL App (1st) 180768, ¶ 32. However, whether we review this case for plain error or for ineffective assistance of counsel, we begin by determining whether an error actually occurred. See *People v. Sargent*, 239 Ill. 2d 166, 189 (2010) ("[The] court typically undertakes plain-error analysis by first determining whether error occurred at all."); *People v. Mahaffey*, 194 Ill. 2d 154, 173 (2000), *overruled on other grounds by People v. Wrice*, 2012 IL 111860, ¶ 75 (noting ineffective assistance of counsel cannot be established where no error occurred).

¶ 37                                    A. Propensity Evidence

¶ 38          Defendant first contends the trial court abused its discretion in allowing evidence under section 115-7.3 regarding the sexual assaults of M.M., D.C., and J.N. He argues the evidence was unduly prejudicial because the assaults were not sufficiently similar to the sexual assault of L.W. and the evidence was so substantial it became a "mini-trial" within the trial.

¶ 39          Evidence of other crimes is generally inadmissible to show a defendant's propensity to commit the charged criminal conduct. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Such evidence, while relevant, is excluded because it "has 'too much' probative value." *Donoho*, 204

Ill. 2d at 170 (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)). Instead, "[e]vidence of other offenses may be admissible to demonstrate 'motive, intent, identity, absence of mistake, *modus operandi*, or any other relevant fact other than propensity.' " *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21 (quoting *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 37). " 'Indeed, other-crimes evidence is admissible to prove any material fact other than propensity that is relevant to the case.' " *People v. Johnson*, 368 Ill. App. 3d 1146, 1154 (2006) (quoting *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005)).

¶ 40 However, other-crimes evidence demonstrating propensity may be admissible under section 115-7.3 when a defendant is charged with one of the enumerated sex offenses in the statute. *People v. Ward*, 2011 IL 108690, ¶ 25; 725 ILCS 5/115-7.3(a) (West 2020) (listing the offenses of criminal sexual assault and aggravated criminal sexual abuse). "The other offenses must have a threshold similarity to the charged conduct to be admissible." *Smith*, 2015 IL App (4th) 130205, ¶ 23.

¶ 41 " 'Where other-crimes evidence meets the initial statutory requirements, the evidence is admissible if it is relevant and its probative value is not substantially outweighed by its prejudicial effect.' " *Smith*, 2015 IL App (4th) 130205, ¶ 21 (quoting *Vannote*, 2012 IL App (4th) 100798, ¶ 38). When weighing the probative value of the other-crimes evidence against any undue prejudice against the defendant, section 115-7.3(c) permits the trial court to consider (1) the proximity in time to the charged offense, (2) the degree of factual similarity to the charged offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.3(c) (West 2020). The trial court must, however, "engag[e] in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186.

¶ 42    A trial court's decision to admit other-crimes evidence will not be reversed on appeal absent an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. "An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75.

¶ 43    Defendant does not argue the evidence was inadmissible based on the proximity in time to the charged offense, nor does the record show the proximity of the events would legitimately be of concern. See, *e.g.*, *Donoho*, 204 Ill. 2d at 184 (holding while the lapse of 12 to 15 years may lessen the probative value of other-crimes evidence, it is insufficient by itself to find an abuse of discretion existed in its admission). As to the similarities in the events, relying primarily on *People v. Lamonica*, 2021 IL App (2d) 200136, defendant argues the propensity evidence was not sufficiently similar to the charged offenses for its probative value to outweigh the prejudice caused by its admission.

¶ 44    In *Lamonica*, the State charged the defendant with aggravated criminal sexual assault. *Lamonica*, 2021 IL App (2d) 200136, ¶ 4. At trial, the victim, L.L., testified she met the defendant through a dating app and met him at a wine restaurant. After becoming intoxicated, L.L. invited the defendant to her apartment. *Lamonica*, 2021 IL App (2d) 200136, ¶¶ 8-9. L.L. gave testimony indicating she was willing to have sex with the defendant, but he was unduly forceful with her. When L.L. told the defendant he was hurting her, she became afraid he would become violent and did not resist until the pain became so bad that she shoved him off her. She admitted the defendant never threatened her, held her down, or grabbed her so hard she could not release his grip. *Lamonica*, 2021 IL App (2d) 200136, ¶¶ 11-13. She reported the incident to the police

after learning the defendant had been arrested for another offense. *Lamonica*, 2021 IL App (2d) 200136, ¶ 16.

¶ 45        At trial, the court admitted propensity testimony from E.S., who testified she met the defendant at a bar and became intoxicated. The defendant accompanied her to her apartment, where she went to sleep. During the night the defendant removed her bra and underwear. The next morning E.S. told the defendant she did not want to have sex with him, but he got on top of her and penetrated her, and she was unable to push him off. Afterward, E.S. asked the defendant to leave, and he would not do so. They argued for about an hour before he left. E.S. went to the hospital where a rape kit was completed. *Lamonica*, 2021 IL App (2d) 200136, ¶¶ 18-24. The State also presented evidence from the sexual assault examiner and a DNA expert.

¶ 46        On appeal from the defendant's conviction, the Second District reversed based on insufficient evidence of use or threat of force. *Lamonica*, 2021 IL App (2d) 200136, ¶ 46. The court then nevertheless found the trial court abused its discretion in admitting the propensity evidence. The court noted L.L. testified the defendant penetrated her in the evening, after their date, while she was drunk, while E.S. testified the defendant forcefully penetrated her in the morning when she was sober. The court stated, other than the defendant inviting the women to wine bars, the two incidents bore little resemblance to one another in any significant way. *Lamonica*, 2021 IL App (2d) 200136, ¶ 54. The court further stated the evidence of other crimes was extensive and unnecessary. *Lamonica*, 2021 IL App (2d) 200136, ¶ 54.

¶ 47        However, in *People v. Kelley*, 2019 IL App (4th) 160598, this court distinguished meaningful factual differences from incidental ones, especially in the context of an abuse-of-discretion standard of review. There, we noted when the identity of the perpetrator was not at issue and the State was not offering the evidence to show *modus operandi*, more general

areas of similarity are sufficient to support admissibility. *Kelley*, 2019 IL App (4th) 160598, ¶ 105. As such, the objective is not to identify factual differences for the sake of identifying factual differences. Instead, the differences must logically matter. "[T]hey have to be relevant, in a commonsensical way, to the probative value of the previous offense as propensity evidence." *Kelley*, 2019 IL App (4th) 160598, ¶ 105. For example, in disagreeing with a Second District case, this court stated:

> "If on one occasion [the defendant] committed sexual assault with the assistance of someone else and on the next occasion he committed sexual assault unassisted, the previous occasion still would be evidence that he had a propensity to commit sexual assault. The same would be true if on the previous occasion the defendant used a car and on the next occasion he did not do so or if on the previous occasion he blew cocaine into the victim's face and on the next occasion he did not do so. Such factual differences are incidental and meaningless unless the identity of the perpetrator is at issue and the State pursues a theory of *modus operandi*, the proof of which always requires 'a high degree of identity between the facts of the crime charged and [those of] the other offense.' (Internal quotation marks omitted.)" *Kelley*, 2019 IL App (4th) 160598, ¶ 105 (quoting *People v. Cruz*, 162 Ill. 2d 314, 349 (1994).

¶ 48   Applying the above reasoning, this court held the admission of propensity evidence was not an abuse of discretion when the factual differences arguably did not greatly reduce the probative value of the testimony. In doing so, this court further noted "our standard of review is the most deferential standard of review known to the law." *Kelley*, 2019 IL App (4th) 160598, ¶ 106 (citing *People v. Radojcic*, 2013 IL 114197, ¶ 33).

¶ 49    Here, we apply the reasoning from *Kelley*. The differences among the offenses are much less meaningful under *Kelley* than they were in *Lamonica*. The sexual assaults of M.M., D.C., and J.N. were all introduced to show a propensity to commit sexual assault and shared multiple facts in common with the sexual assault of L.W. In each case, defendant invited young women who felt safe being alone with him to meet him. Each woman rode in a vehicle with defendant when defendant had consumed alcohol. He then sexually assaulted them afterward. In each case, the women were unable to legally consent. The primary factual differences, that L.W. did not drink and could not consent because of her age, did not greatly reduce the probative value of the evidence to show defendant had a propensity to commit sexual assault. Other differences such as the location of the assaults is inconsequential.

¶ 50    Defendant particularly argues L.W. was forcibly assaulted and the other women were not, but the overriding similarity in all cases was a clear pattern of defendant inviting young women to meet with him when he had been drinking and then sexually assaulting them. The trial court carefully considered the similarities and differences among the offenses and did not abuse its discretion in determining there were sufficient similarities to admit the evidence.

¶ 51    Defendant also argues the propensity evidence improperly became the focal point of the trial, leading to undue prejudice. In doing so, he relies in part on *Lamonica* and *People v. Cardamone*, 381 Ill. App. 3d 462 (2008). He also spends a significant portion of his brief distinguishing *People v. Walston*, 386 Ill. App. 3d 598 (2008).

¶ 52    "Our supreme court has urged trial courts 'to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence.' " *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47 (quoting *Donoho*, 204 Ill. 2d at 186). "When weighing the prejudicial effect

of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury." *Perez*, 2012 IL App (2d) 100865, ¶ 47 (citing *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006)). The overriding rationale for not permitting "mini-trials" of a collateral offense is due to the risk that it will cause unfair prejudice to the defendant, jury confusion, or delay. *Walston*, 386 Ill. App. 3d at 619.

¶ 53    In *Walston*, the Second District addressed the issue of "mini-trials" in the context of section 115-7.3 cases and determined the danger of unfair prejudice to a defendant was not as great as in common-law other-crimes cases. *Walston*, 386 Ill. App. 3d at 619-20. Specifically, the court stated:

> "[T]he danger of unfair prejudice in the context of a section 115-7.3 case, as opposed to a common-law other-crimes case, is greatly diminished. *** [T]he common-law rule against other-crimes evidence is essentially a *per se* application of the rule that unfairly prejudicial evidence should not be admitted even if probative. [Citation.] When the legislature enacted section 115-7.3, it upended this rule with respect to the types of crimes listed in the section, so that not only is other-crimes evidence offered to show propensity no longer *per se* unfairly prejudicial, it is actually proper. As a result, the danger of unfair prejudice in a section 115-7.3 case may still exist, but it is much less pronounced than in a common-law other-crimes case. [Citation.] Accordingly, while a 'mini-trial' of a collateral offense can cause undue prejudice in a section 115-7.3 case, it is not necessary in such a case that a court 'carefully limit[ ] the details of the other crime to what is necessary to "illuminate the issue for which the other crime was introduced" ' [citation] to the extent required in common-law other-crimes cases." *Walston*, 386 Ill. App. 3d at 619-20.

¶ 54    In *People v. Bates*, 2018 IL App (4th) 160255, ¶ 89, this court relied on *Walston* in finding no impermissible "mini-trial" following the admission of propensity evidence under section 115-7.3. There, the State's other-crimes evidence included testimony from the defendant's alleged victim in another case, testimony from a nurse who evaluated that victim, a forensic scientist who testified the defendant's DNA was found on swabs taken from the previous victim, and an interrogation video related to the other crime. *Bates*, 2018 IL App (4th) 160255, ¶ 88. We stated the "mini-trial" in that case "was necessary to establish [the] defendant's involvement in the attack on [the other victim]." *Bates*, 2018 IL App (4th) 160255, ¶ 89.

¶ 55    Relying on *Lamonica* and *Cardamone*, defendant attempts to distinguish *Walston* and *Bates*, arguing the amount of propensity evidence became the focal point of the trial. He contends the "vast majority" of the evidence consisted of propensity evidence, most of which was cumulative and unnecessary. We disagree.

¶ 56    In *Cardamone*, the Second District noted there might be times when the sheer volume of other-crimes evidence renders it unduly prejudicial. *Cardamone*, 381 Ill. App. 3d at 496-97. There, the trial court admitted testimony regarding at least 158 uncharged acts against 15 victims. *Cardamone*, 381 Ill. App. 3d at 491, 494. On appeal, the Second District held the volume of the other-crimes evidence was overwhelming and undoubtedly more prejudicial than probative. *Cardamone*, 381 Ill. App. 3d at 497. The court further found the "admission of so many allegations of uncharged conduct, many of which were vague as to dates, placed [the] defendant in the impossible position of accounting for his whereabouts and behavior almost all day, every day, over a three-year period." *Cardamone*, 381 Ill. App. 3d at 494.

¶ 57    "Simply put, *Cardamone* was an extreme case." *Perez*, 2012 IL App (2d) 100865, ¶ 49. Thus, as the Second District has also recognized, "*Cardamone* did not purport to hold that

anytime the evidence of other crimes outnumbers that of the charged incidents, the prejudicial effect renders the other-crimes evidence inadmissible." *Perez*, 2012 IL App (2d) 100865, ¶ 49. Instead, *Cardamone* was a case of " 'prosecutorial overkill.' " See *Walston*, 386 Ill. App. 3d at 618 (quoting *People v. Funches*, 59 Ill. App. 3d 71, 73 (1978)). Thus, in *Kelley*, this court relied on *Walston* and noted propensity evidence would amount to a "mini-trial" only if it "was so overabundant as to 'cause jury confusion or unnecessary delay.' " *Kelley*, 2019 IL App (4th) 160598, ¶ 110 (quoting *Walston*, 386 Ill. App. 3d at 620).

¶ 58          In the case before us, we find *Walston* and *Bates* best address the issues presented by the facts rather than *Cardamone* and *Lamonica*. To the extent defendant argues corroborating other-crimes evidence is not allowed under section 115-7.3, we disagree. As held in *Bates*, where not only the testimony of the alleged other-crime victim was presented, but also evidence corroborating that victim's testimony, such evidence may be necessary to establish the defendant's involvement in the other crime and, thus, the defendant's propensity for committing sex offenses. *Bates*, 2018 IL App (4th) 160255, ¶ 89.

¶ 59          There is no question the acts against M.M., D.C., and J.N. were highly probative and part of a clear pattern of sexual assaults by defendant. While we recognize the total amount of propensity evidence was significant, we also observe it was limited to three principal victims who provided specific dates and details of the assaults, and the testimony of each corroborating witnesses was comparatively short. The propensity evidence was relatively straightforward and not the vague "prosecutorial overkill" as seen in *Cardamone*. We further note, unlike in *Lamonica*, where the victim's testimony contained inconsistencies confusing to the jury, here L.W.'s testimony was clear, as was the propensity testimony.

¶ 60    Ultimately, we again stress the importance of the standard of review. At exactly what point the quantity of evidence becomes unduly prejudicial is left to the trial court's discretion, and reviewing courts have noted that "it is difficult to determine precisely where to draw the line." *Cardamone*, 381 Ill. App. 3d at 497.

> "Thus, while undue prejudice *can* arise in a section 115-7.3 case, 'the actual limits on the trial court's decisions on the quantity of propensity evidence to be admitted under section 115-7.3 are relatively modest, especially when combined with the highly deferential abuse-of-discretion standard that governs review of such trial court decisions.' " (Emphasis in original.) *Perez*, 2012 IL App (2d) 100865, ¶ 49 (quoting *Walston*, 386 Ill. App. 3d at 621).

Overall, the trial court here did not abuse its discretion in allowing the propensity evidence, as it was not so great it caused unfair prejudice to the defendant, jury confusion, or delay. See *Walston*, 386 Ill. App. 3d at 619-20.

¶ 61    B. Evidence of Statements About Self-Harm

¶ 62    Defendant next contends the trial court abused its discretion in in allowing Madelyn to testify about defendant's statements of self-harm. He argues the evidence was not admissible to show propensity and was not relevant for any other purpose. The State argues the evidence was admissible as part of a continuing course of conduct.

¶ 63    Evidence is relevant if it has any tendency to make the existence of any fact consequential to the determination of an action either more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides evidence of other crimes, wrongs, or acts may be admissible for purposes other than to show propensity, such as such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident. Evidence may also be permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge. *People v. Brown-Engel*, 2018 IL App (3d) 160368, ¶ 21 (citing 1 John W. Strong, McCormick on Evidence § 190, at 660, 664 (5th ed. 1999)).

¶ 64　　　　Evidence of other crimes or bad acts may also be admissible when part of a continuing narrative of the events giving rise to the offense, intertwined with the charged offense, or it explains an aspect of the charge that would otherwise be implausible or inexplicable. *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58. Thus, events forming a continuing narrative, even if they reflect negatively on the defendant, may be permitted when the events are "linked and it would be illogical for the trial court to uncouple them and give the jury only half the story." *People v. Pikes*, 2013 IL 115171, ¶ 24. However, "evidence may not be admitted under the continuing-narrative exception, even when the crimes occur in close proximity, if the crimes are distinct and 'undertaken for different reasons at a different place at a separate time.' " *People v. Adkins*, 239 Ill. 2d 1, 33 (2010) (quoting *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980)).

¶ 65　　　　The admissibility of other-crimes evidence rests within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of discretion. *People v. Heard*, 187 Ill. 2d 36, 58 (1999). "Erroneous admission of other-crimes evidence calls for reversal only if the evidence was 'a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different.' " *Adkins*, 239 Ill. 2d at 23 (quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)). "In other words, the evidence 'must be so prejudicial that the defendant is denied a fair trial.' " *Patterson*, 2013 IL App (4th) 120287, ¶ 59 (quoting *People v. Pelo*, 404 Ill. App. 3d 839, 865 (2010)). "An evidentiary issue is harmless when no reasonable probability exists that the jury would have acquitted the defendant absent the error."

*Pelo*, 404 Ill. App. 3d at 865, *abrogated on other grounds*, *People v. Veach*, 2017 IL 120649, ¶¶ 39, 48.

¶ 66        Here, Madelyn's testimony was not introduced as evidence of other crimes to show propensity under section 115-7.3. Indeed, it was not evidence of another "crime" at all, and the trial court did not admit it to show a general propensity to commit a crime. Instead, the trial court admitted it to show context and a continuing narrative of the facts of the case, to further explain why L.W. left her home to meet defendant. While defendant argues his previous statements of self-harm to Madelyn were not sufficiently "linked" to his statements to L.W. to constitute a continuing narrative, we disagree. The commonality of defendant's use of statements of self-harm to get his way helped explain facts associated with L.W.'s assault. Because L.W. had previously refused to sneak out of her house to meet defendant, the testimony provided context as to why defendant made such statements to convince her to do so. Further, defendant's use of statements of self-harm with Madelyn illustrated a reason why he also threatened self-harm to L.W. and then did not make any further such statements once L.W. met with him. Without Madelyn's testimony, the reason defendant ceased making statements of self-harm once he convinced L.W. to meet him would have been unaddressed and unclear.

¶ 67        Likewise, we further conclude the statements were evidence of an intent, motive, or plan to convince L.W. to leave her home under false pretenses with a motive to get her to meet defendant, not to discuss his statements of self-harm, but for other purposes. As such, the trial court did not abuse its discretion in admitting the testimony. We may affirm the circuit court on any basis supported by the record. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005).

¶ 68        Finally, even if we were to find the evidence should not have been admitted in any respect, we cannot say it was a material factor in defendant's convictions such that, without the

evidence, a different verdict would likely have resulted. Here, the trial court explicitly limited the evidence, stating it would not allow it to be used for improper purposes. The State's questions to Madelyn about the matter were short, consisting of only four questions. Excluding Madelyn's testimony, the remaining evidence presented at defendant's trial was more than sufficient to sustain his convictions.

¶ 69                                    C. Admission of Memes

¶ 70        Defendant next argues the trial court erred in allowing evidence of the memes found on his phone. Defendant argues the memes were not relevant because of insufficient foundation to authenticate them when there was no evidence defendant looked at the memes or "endorsed them in some way." The State argues the law does not require foundation showing defendant "endorsed" the content of the memes and that it presented sufficient foundation to authenticate them.

¶ 71        While the authentication of memes appears to be a novel issue, as to a proper foundation for admission, we treat text messages obtained from a phone like any other form of documentary evidence. See *People v. Price*, 2021 IL App (4th) 190043, ¶ 115; *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. For the reasons stated below, we conclude the logic for treating text messages obtained from a phone like any other form of documentary evidence applies equally well to memes found on a phone.

¶ 72        There is a lack of support to treat any electronic documents, such as memes, found on a phone, differently than any other form of documentary evidence. For example, in *People v. Chromik*, 408 Ill. App. 3d 1028, 1047 (2011), the Third District relied on a North Dakota case, *State v. Thompson*, 2010 ND 10, 777 N.W.2d 617, to find text messages were sufficiently authenticated. Relying in turn on a Pennsylvania case, the *Thompson* court wrote:

" 'Essentially, appellant would have us create a whole new body of law just to deal with e-mails or instant messages. The argument is that e-mails or text messages are inherently unreliable because of their relative anonymity and the fact that while an electronic message can be traced to a particular computer, it can rarely be connected to a specific author with any certainty. Unless the purported author is actually witnessed sending the e-mail, there is always the possibility it is not from whom it claims. As appellant correctly points out, anybody with the right password can gain access to another's e-mail account and send a message ostensibly from that person. However, the same uncertainties exist with traditional written documents. A signature can be forged; a letter can be typed on another's typewriter; distinct letterhead stationary can be copied or stolen. We believe that e-mail messages and similar forms of electronic communication can be properly authenticated within the existing framework of [Pennsylvania law]. We see no justification for constructing unique rules for admissibility of electronic communications such as instant messages; they are to be evaluated on a case-by-case basis as any other document to determine whether or not there has been an adequate foundational showing of their relevance and authenticity.' "
*Thompson*, 2010 ND 10, ¶ 25 (quoting *In re F.P.*, 878 A.2d 91, 95 (Pa. Super. Ct. 2005)).

Along those lines, the Texas Court of Criminal Appeals in *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) stated:

"Courts and legal commentators have reached a virtual consensus that, although rapidly developing electronic communications technology often presents new and

protean issues with respect to the admissibility of electronically generated, transmitted and/or stored information, including information found on social networking web sites, the rules of evidence already in place for determining authenticity are at least generally 'adequate to the task.' Widely regarded as the watershed opinion with respect to the admissibility of various forms of electronically stored and/or transmitted information is *Lorraine v. Markel American Insurance Co.* There the federal magistrate judge observed that 'any serious consideration of the requirement to authenticate electronic evidence needs to acknowledge that, given the wide diversity of such evidence, there is no single approach to authentication that will work in all instances.' Rather, as with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 638-39.

¶ 73    The Third Circuit in the case of *United States v. Browne*, 834 F.3d 403 (3d Cir. 2016), also stated:

"We hold today that it is no less proper to consider a wide range of evidence for the authentication of social media records than it is for more traditional documentary evidence. The authentication of electronically stored information in general requires consideration of the ways in which such data can be manipulated or corrupted, [citation], and the authentication of social media evidence in particular presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an

imposter, [citation]. But the authentication rules do not lose their logical and legal force as a result. [Citations.] Depending on the circumstances of the case, a variety of factors could help support or diminish the proponent's claims as to the authenticity of a document allegedly derived from a social media website, and the Rules of Evidence provide the courts with the appropriate framework within which to conduct that analysis." *Browne*, 834 F.3d at 412.

¶ 74 We find the reasoning of the above courts persuasive and conclude the same reasoning applies to the authentication of the memes here. Accordingly, we address memes obtained from a phone like any other form of documentary evidence.

¶ 75 In that regard, " '[a] proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated.' " *Price*, 2021 IL App (4th) 190043, ¶ 115 (quoting *Ziemba*, 2018 IL App (2d) 170048, ¶ 51). Authentication of documentary evidence requires the proponent to present evidence the document is what the proponent claims it to be. *Price*, 2021 IL App (4th) 190043, ¶ 115; see also Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). To do so, "[t]he proponent need prove only a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged." *Ziemba*, 2018 IL App (2d) 170048, ¶ 51. The trial court's finding of authentication is merely a finding there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the authentication requirements are satisfied. *Ziemba*, 2018 IL App (2d) 170048, ¶ 51 "If the court, after serving its screening function, allows the evidence to be admitted, the issue of the document's authorship is ultimately for the jury to determine." *Ziemba*, 2018 IL App (2d) 170048, ¶ 51.

¶ 76 Documentary evidence may be authenticated by either direct or circumstantial evidence. *Price*, 2021 IL App (4th) 190043, ¶ 117; *Ziemba*, 2018 IL App (2d) 170048, ¶ 52, " 'Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances.' " *Price*, 2021 IL App (4th) 190043, ¶ 117 (quoting *Ziemba*, 2018 IL App (2d) 170048 ¶ 52). " 'Documentary evidence, therefore, may be authenticated by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author.' " *Price*, 2021 IL App (4th) 190043, ¶ 117 (quoting *Ziemba*, 2018 IL App (2d) 170048, ¶ 52). " 'A trial court's decision to admit documentary evidence will not be reversed absent an abuse of discretion.' " *Ziemba*, 2018 IL App (2d) 170048, ¶ 50 (quoting *Chromik*, 408 Ill. App. 3d at 1046).

¶ 77 In *Price*, we recently endorsed the use of the following nonexhaustive list of factors for a trial court to consider when determining if a party has made a *prima facie* showing of authentication:

> " '(1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or (6) other circumstances peculiar to the particular

- 28 -

case may suffice to establish a *prima facie* showing of authenticity.' " *Price*, 2021 IL App (4th) 190043 ¶ 118 (quoting *People v. Kent*, 2017 IL App (2d) 140917, ¶ 118).

These six factors have also been cited with approval by our supreme court. *People v. Brand*, 2021 IL 125945, ¶ 44.

¶ 78            Here, through Orr, the State was able to establish the phone, taken from defendant at his arrest, actually belonged to him. Defendant provided the passcode to gain access to the phone. Indeed, no one disputed it was defendant's phone. Orr testified the extraction report revealed the source files for the memes were created and modified on defendant's phone with identical time stamps for each. Further, the phone revealed a text conversation between defendant and his girlfriend, Stein, which she identified and thereby authenticated as well. More importantly, the conversation with Stein happened almost contemporaneously with the "creation" or "modification" of the memes—whether by merely opening them to view, or otherwise. That the evidence showed the memes were created and modified while defendant exchanged text messages with Stein provided circumstantial evidence the memes belonged to him, as it would be unlikely anyone else had possession of his phone at that time. Stein also testified defendant belonged to a chat group where memes were shared. The content of the memes is also not in dispute. Thus, here, the trial court did not abuse its discretion, as there was direct and circumstantial evidence the memes were what the State claimed them to be—memes from defendant's phone. See *Ziemba*, 2018 IL App (2d) 170048, ¶ 53. At that point, after the court served its screening function, further issues of the document's use, authorship, or the weight they should be accorded were ultimately for the jury to determine. See *Ziemba*, 2018 IL App (2d) 170048, ¶ 51.

¶ 79　　　　　Nevertheless, defendant relies on *People v. Pulliam*, 176 Ill. 2d 261, 276-77 (1997), as support for his argument the State failed to present adequate evidence to authenticate the memes. There, the trial court allowed evidence that police found a book titled "The Force of Sex" on a table in the defendant's apartment two days after a murder. *Pulliam*, 176 Ill. 2d at 276. However, allowing the evidence was in error when there was no testimony offered about the book's contents or who owned or had read the book. Therefore, the court lacked a sound basis to conclude the book was relevant to the crime. *Pulliam*, 176 Ill. 2d at 277. Thus, in *Pulliam*, authentication was entirely lacking. Such was not the case here.

¶ 80　　　　　Defendant also relies on *Kent* and *Brand* for the argument the State failed to show he "endorsed" or was "responsible for" the memes. In both *Kent* and *Brand*, "authentication" included efforts to establish the defendant was the author of questioned social media posts—a Facebook post in *Kent* and messages on Facebook Messenger in *Brand*. Even under those circumstances, the courts said the list of authentication factors list was not exhaustive but was " 'intended only as a guide' " and the " ' "[e]vidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context." ' " *Brand*, 2021 IL 125945, ¶ 45 (quoting *Kent*, 2017 IL App (2d) 140917, ¶ 119, quoting *United States v. Vayner*, 769 F.3d 125, 133 (2d Cir. 2014)).

¶ 81　　　　　As previously noted, all that was required of the State in this instance, was "to present evidence that the document is what the proponent claims it to be." (Internal quotation marks omitted.) *Price*, 2021 IL App (4th) 190043, ¶ 115. The *Ziemba* court recognized the State had to present sufficient evidence to provide the fact finders with a rational basis for concluding the document did in fact belong to *or* was authored by the party alleged. *Ziemba*, 2018 IL App (2d)

170048, ¶ 51. Within the context of this case, the purpose of seeking to admit the memes was not to establish defendant as the author, but to show the memes were on his phone and may have been viewed, sent, received, or otherwise generated while he was actively using his phone.

¶ 82　　　We stress "[t]he bar for authentication of evidence is not particularly high." (Internal quotation marks omitted.) *Vayner*, 769 F.3d at 130. "[T]he proponent need not rule out all possibilities inconsistent with authenticity," but need only adduce sufficient proof so a reasonable juror could find in favor of authenticity. (Internal quotation marks omitted.) *Vayner*, 769 F.3d at 130. Once an item of evidence is "authenticated" this "merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury," for which "the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning," with all such challenges going to the weight of the evidence rather than its initial admissibility. (Internal quotation marks omitted.) *Vayner*, 769 F.3d at 131.

¶ 83　　　Here, the State presented sufficient foundation evidence to show the memes "belonged" to defendant in that they were on his phone and created/modified at the same time as another identified conversation with Stein, all of which took place in close temporal proximity with the offense and two of the three sexual assaults admitted as propensity evidence. Thus, the trial court did not abuse its discretion in allowing the evidence.

¶ 84　　　　　　　　　　　　D. Cumulative Error

¶ 85　　　Finally, defendant argues cumulative error. Because we have found no error at all, cumulative error does not apply. Likewise, plain error and ineffective assistance of counsel do not apply.

¶ 86　　　　　　　　　　　　III. CONCLUSION

¶ 87        The trial court did not abuse its discretion in its evidentiary determinations. Accordingly, for the reasons stated, we affirm the trial court's judgment.

¶ 88        Affirmed.

¶ 89        JUSTICE DOHERTY, specially concurring:

¶ 90        In my view, the majority has reached the proper disposition in this case. For the reasons so capably stated by the majority, I agree that it was not an abuse of discretion for the trial court to admit the other-crimes evidence under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2020)) or the evidence of self-harm. While it is my view that the admission of the meme evidence was error on the facts of this case for the reasons stated below, I believe that any error was harmless. Thus, I agree that affirmance is required here. I write separately to address the propriety of the admission of memes found on defendant's phone without evidence that he authored, agreed with, or even saw them.

¶ 91        Authentication "as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). Here, the State claimed that the memes were images found on defendant's phone. The foundational testimony offered by Orr and Chumley was sufficient to authenticate the memes, *i.e.*, to prove that they were found on defendant's phone. But authentication is not all that is required for admission of evidence; it must still be *relevant*. If the State properly authenticated the memes as having been found on *some other person's* phone, even incontestable authentication of such evidence would not make it relevant to the case against this defendant. It is still important to understand what the proponent claims the evidence proves. The question becomes why are the memes on defendant's phone—with no evidence of where they

came from, whether he saw them, and whether he agreed with their content—relevant to the case against him?

¶ 92        The following comments from Justice Wright's concurrence in *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 58 (Wright, J., specially concurring), capture the essence of the issue presented here:

> "I conclude that the receipt of a particular text message that has not triggered a response from the recipient proves nothing about the habits or intentions of the designated recipient. Based on my own experience, I emphasize that a cell phone user cannot control the content of messages directed to a personal cell phone. In fact, persons, both known and unknown, elect to send uninvited, unexpected, and sometimes unwelcome text messages to other persons." (Emphases omitted.)

¶ 93        Similarly, the State's evidence here proved that the three memes in question were found on defendant's phone, but there was a complete absence of evidence showing how the memes got there or whether defendant had even *seen* them, much less agreed with them. The prosecutor argued that, while there was no evidence that defendant created the memes, "we all know if it's on your phone, it's on your mind." In the first instance, this statement is simply not correct if the defendant had not *seen* the memes. But the more fundamental issue is whether we will permit any communication *received* by a person as evidence of what they were thinking or what they believe.

¶ 94        In this context, I believe that the supreme court's decision in *People v. Pulliam*, 176 Ill. 2d 261 (1997), demonstrates that admission of the memes was error. In *Pulliam*, the defendant was charged with, among other things, the murder and sexual assault of a child. Two days after

the crime, a police officer found a book entitled, "The Force of Sex," in the defendant's apartment. The trial court allowed this fact into evidence, but the supreme court found it to be error:

> "We hold that the trial court erred in admitting the book into evidence. First, *because there was no testimony that defendant owned or had read the book*, or concerning the nature of its contents, the court had no sound basis for concluding that the book was relevant to the crimes. Second, the fact that the apartment was unsecured for two days before the book was found further diminished the book's relevance to defendant's role in the crimes. Given these circumstances, the trial court abused its discretion in admitting the book." (Emphasis added.) *Id.* at 276-77.

¶ 95   Here, as in *Pulliam*, there is no evidence that defendant read the memes or that he agreed with them (such as might be shown if he had shared them). All we know is that they appeared on his phone by some unspecified means. On the surface, one element of *Pulliam* might seem different from the facts here, as the book at issue in *Pulliam* was found in an apartment which was unsecured for two days; the implication is that another person might have planted the book. But a cell phone is generally "unsecured" in more fundamental ways, and for much longer periods of time. As stated by Justice Wright in her special concurrence in *Watkins*, a "user cannot control the content of messages directed to a personal cell phone." *Watkins*, 2015 IL App (3d) 120882, ¶ 58 (Wright, J., specially concurring).

¶ 96   The State argued that the relevance of the memes here was that they gave us some insight into what defendant was thinking. That would surely be true if, for example, defendant had seen the memes and shared them, or had regularly solicited memes of this nature by signing up at some sort of website that propagates them. The evidence here, however, is simply that the memes

were *received* on defendant's phone, and mere receipt gives no insight into defendant's thinking any more than a newspaper on one's porch indicates agreement with everything printed in it.

¶ 97        It is important to recognize how limited the testimony with respect to the telephone retrieval of the memes was in this case. The evidence is that each of the three memes was "created" at exactly the same time it was "modified," down to the second. The State here wisely did not argue that defendant himself "modified" the memes at such lightning speed. The extraction report introduced as People's exhibit No. 6 shows that the memes were found in a subdirectory of defendant's phone named "Thumbnails." The State's experts gave almost no insight into how or why the thumbnail images were created on the phone. All we know is that their creation approximately coincided with a time defendant was also using his phone to text Stein, but there was no evidence that the memes were in any way a part of those or any other communications.

¶ 98        However, while I believe admission of the memes was error, I believe the error was harmless. The admission of irrelevant evidence is subject to harmless error analysis when overwhelming evidence supports the conviction. *People v. Hobley*, 159 Ill. 2d 272, 311 (1994); *People v. Gill*, 54 Ill. 2d 357, 369 (1973). In this case, the evidence against defendant was overwhelming, resulting in the error in admission of the memes being harmless beyond a reasonable doubt.

¶ 99        For the aforementioned reasons, I specially concur.

*People v. Watts*, 2022 IL App (4th) 210590

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Pike County, No. 20-CF-51; the Hon. Alan D. Tucker, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Joshua Scanlon, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Zachary P. Boren, State's Attorney, of Pittsfield (Patrick Delfino, David J. Robinson, and John M. Zimmerman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |